*United States v. Zemlyansky*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term 2017

(Argued: September 12, 2017   Decided: November 5, 2018)

Docket No. 16-409

UNITED STATES OF AMERICA,

*Appellee,*

v.

MIKHAIL ZEMLYANSKY,

*Defendant-Appellant.*[*]

_____

Before:

JACOBS, CABRANES, AND WESLEY, *Circuit Judges.*

_____

Defendant-appellant Mikhail Zemlyansky appeals from a February 1, 2016 judgment of conviction entered after a jury trial in the United States District Court for the Southern District of New York (Oetken, *J.*). In 2013, Zemlyansky was tried for substantive and conspiracy crimes relating to healthcare fraud. He was acquitted of all counts except for conspiring to engage in racketeering in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d), a count on which the jury failed to reach a verdict. In 2015, Zemlyansky was tried

_____

[*] The Clerk of the Court is directed to amend the caption as set forth above.

for substantive and conspiracy counts relating to insurance and investment-fraud schemes. He was again charged with conspiring to violate RICO, predicated in part on crimes of which he was acquitted at his first trial. On appeal, he argues that his constitutional rights were violated under the Fifth Amendment's Double Jeopardy Clause. He also argues that improper prosecutorial comments and the District Court's evidentiary rulings violated his Fifth and Sixth Amendment rights. The judgment is AFFIRMED.

––––––––––––

JOSHUA NAFTALIS, Assistant United States Attorney (Daniel Goldman, Daniel Noble, Margaret Garnett, Assistant United States Attorneys, *on the brief*) *for* Geoffrey S. Berman, United States Attorney for the Southern District of New York, New York, NY, *for Appellee*.

JERALD BRAININ, Los Angeles, CA, *for Defendant-Appellant*.

––––––––––––

WESLEY, *Circuit Judge*:

Twice—in 2013 and 2015—the Government tried defendant-appellant Mikhail Zemlyansky for his alleged involvement in criminal activity. The first jury did not convict him, but the second jury did. On appeal, Zemlyansky argues that the second conviction amounted to double jeopardy, because the Government secured the conviction by proving an issue the first jury had already decided in his favor. We are asked to decide whether the issue-preclusion component of the Double Jeopardy Clause prohibits the Government from predicating a Racketeer Influenced and Corrupt Organizations Act ("RICO") conspiracy charge on acts mirroring the defendant's earlier substantive and conspiracy acquittals. We

2

conclude it does not. We also reject Zemlyansky's other arguments regarding constitutional error in his second trial. Accordingly, the judgment is **AFFIRMED**.

## BACKGROUND

### I.     Zemlyansky's Criminal Schemes[1]

Zemlyansky was involved in several criminal schemes from before 2007 until his first indictment in 2013. These schemes included Lyons Ward; the Rockford Group; the Illegal Gambling Ring; and the No-Fault Insurance Organization.

#### A.     *Lyons Ward*

In 2007, Zemlyansky started a fraudulent investment firm, "Lyons, Ward & Associates." The firm purported to invest in insurance-settlement claims, and it received almost $7 million from investors by guaranteeing them an 18% yearly return. But their money was never invested; instead, it was embezzled and then laundered through shell companies. To perpetuate the scheme, Zemlyansky issued false account statements and small interest payment checks to investors.

---

[1] The following facts are drawn from the evidence presented at trial and described in the light most favorable to the Government. *See United States v. Litwok*, 678 F.3d 208, 210–11 (2d Cir. 2012).

### B. Rockford Group

In 2009, Zemlyansky started "Rockford Funding Group LLP." Like Lyons Ward, the Rockford Group was built on falsehoods and ultimately garnered approximately $10 million in investments. The proceeds from the two securities fraud schemes were wired to and from shell companies located in the United States and overseas.

### C. Illegal Gambling Ring

Around the time Zemlyansky ran the Lyons Ward and Rockford Group securities fraud schemes, he also operated an illegal, high-stakes poker ring in Brooklyn, New York.

### D. No-Fault Insurance Organization

Between 2009 and February 2012, Zemlyansky and his co-defendant Michael Danilovich owned and controlled medical professional corporations ("P.C.s"). These P.C.s fraudulently billed insurance companies for millions of dollars under New York's No-Fault Comprehensive Motor Vehicle Insurance Reparations Act, N.Y. Ins. Law § 5101 *et seq.*

Under the No-Fault Act, individuals injured in car accidents assign their statutory benefits to licensed medical professionals, who submit claims for

4

medically "necessary" treatments directly to the injured party's insurance carriers. *See id.* § 5102; N.Y. Comp. Codes R. & Regs. tit. 11, § 65-3.11 (providing for assignment). Zemlyansky and Danilovich, who were not medical professionals, owned and controlled more than ten P.C.s in Brooklyn. The claims the P.C.s submitted to insurance companies were misleading, both because they often were for unnecessary treatments and because they represented that medical professionals owned and controlled the P.C.s. Zemlyansky and Danilovich profited from insurance payments, fee-sharing arrangements, and kickbacks for referrals. They collected their profits from this no-fault insurance scheme, in part, through a series of wire transfers to and from shell companies overseas.

## II. The S13 Indictment and First Trial

In May 2013, a federal grand jury returned the Superseding Indictment S13 ("S13 Indictment," or "first indictment"), charging Zemlyansky, Danilovich, and others with nine counts relating to the No-Fault Insurance Organization. The S13 Indictment did not include allegations relating to the Lyons Ward or Rockford Group securities fraud schemes, or to the Illegal Gambling Ring.

Count One of the S13 Indictment charged Zemlyansky with conspiring to participate in the affairs of a RICO enterprise, 18 U.S.C. § 1962(d). The charged

5

racketeering enterprise was the No-Fault Insurance Organization, and the pattern of racketeering consisted of mail fraud, 18 U.S.C. § 1341, and money laundering, *id.* §§ 1956–57.

The S13 Indictment also charged Zemlyansky with eight counts that mirrored the RICO conspiracy's predicate offenses: conspiracy to commit healthcare fraud, 18 U.S.C. § 1347, 1349 (Count Two); substantive healthcare fraud, *id.* §§ 2, 1347 (Count Three); conspiracy to commit mail fraud, *id.* § 1349 (Count Four); mail fraud, *id.* §§ 2, 1341, 1349 (Count Five); conspiracy to commit money laundering, *id.* §§ 1956(h), 1957 (Count Six); and substantive money laundering, *id.* §§ 1956–57 (Counts Seven, Eight, and Nine).

On November 13, 2013, after a trial that lasted eight weeks, the jury acquitted Zemlyansky of the non-RICO conspiracy and substantive counts, Counts Two through Nine. The jury was unable to reach a verdict with respect to the RICO conspiracy count, Count One. The District Court declared a mistrial on that Count.

### III. The S18 Indictment and Second Trial

Following the mistrial, a grand jury in 2015 returned the Superseding Indictment S18 ("S18 Indictment," or "second indictment") against Zemlyansky

6

and others. The S18 Indictment contained six counts. Count One charged Zemlyansky with conspiring to violate RICO as a member of an expanded enterprise: the "Zemlyansky/Danilovich Organization." Like the racketeering enterprise alleged in the first indictment, the Zemlyansky/Danilovich Organization encompassed conduct relating to the No-Fault Insurance Organization. But the Zemlyansky/Danilovich Organization also encompassed conduct relating to Lyons Ward, the Rockford Group, and the Illegal Gambling Ring.

The S18 Indictment also charged Zemlyansky with five substantive counts relating to Lyons Ward. Those charges were: conspiracy to commit securities fraud, 18 U.S.C. § 371, 15 U.S.C. § 78j(b) (Count Two); substantive securities fraud, 15 U.S.C. §§ 78j(b), 78ff, 17 C.F.R. § 240.10b–5 (Count Three); conspiracy to commit mail and wire fraud, 18 U.S.C. §§ 1341, 1349 (Count Four); mail fraud, *id.* § 1341 (Count Five); and wire fraud, *id.* §§ 1343, 1349 (Count Six).

Zemlyansky moved to dismiss the RICO conspiracy count (Count One) and to preclude the Government from offering evidence of his involvement in the No-Fault Insurance Organization to prove that Count. He argued that under the issue-preclusion component of the Double Jeopardy Clause, the Government could not

7

offer evidence of the insurance-fraud-related crimes of which he had been acquitted to prove the new RICO conspiracy charge. The District Court initially denied Zemlyansky's motion. *United States v. Zemlyansky*, No. 12-CR-171-1 (JPO), 2016 WL 111444 (S.D.N.Y. Jan. 11, 2016). Ultimately, however, it granted the motion in part, precluding the Government from arguing Zemlyansky was guilty of insurance fraud, while allowing "evidence of Mr. Zemlyansky's involvement in the alleged no-fault scheme insofar as such conduct [went] to his alleged guilt on the RICO conspiracy charge." Joint App. 358.

Two occurrences at Zemlyansky's second trial are the focus of his other challenges on appeal: the prosecution's comments in summation and the introduction of an audio-recording transcript. First, during rebuttal summation, the prosecution mentioned to the jury that Zemlyansky had cried during the testimony of a government witness. The District Court ordered the Government to "move on" and later issued a curative instruction. Joint App. 549–50. The District Court subsequently denied Zemlyansky's motion for either a mistrial or to reopen the proceedings to allow defense counsel to present an alternative explanation of Zemlyansky's demeanor. Second, the District Court admitted, over Zemlyansky's objection and subject to a limiting instruction, a government-

8

prepared transcript that identified Zemlyansky as the declarant in an incriminating audio recording. The District Court further allowed the jury to use the transcript as an aid during deliberations.

After a month-long trial, the jury convicted Zemlyansky of all six counts. The special verdict form reflected the jury's determination that Zemlyansky was liable for all five of the RICO conspiracy count's predicate acts.

The District Court denied Zemlyansky's motion for a new trial and sentenced him principally to 180 months' imprisonment and three years' supervised release. It also ordered him to forfeit $29,575,846 and to pay restitution of $27,741,579.67. Zemlyansky timely appealed his conviction and sentence.[2]

On appeal, Zemlyansky renews his argument that his conviction of the RICO conspiracy count charged in the second indictment violated his Fifth Amendment right to be free from double jeopardy. He also maintains that the prosecution's rebuttal summation comments on his courtroom demeanor violated his Fifth and Sixth Amendment rights against self-incrimination, to adverse witness confrontation and conflict-free counsel, and to a fair trial. He further

---

[2] On appeal, Zemlyansky makes arguments only with respect to his conviction; he has thus waived any challenges to his sentence. *See JP Morgan Chase Bank v. Alto Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005) (arguments not raised in an appellant's opening brief are waived).

9

argues that the District Court's evidentiary ruling admitting the transcript violated his Sixth Amendment right to a fair trial. These errors, Zemlyansky urges, amount to cumulative error.

## DISCUSSION[3]

### I. Double Jeopardy and Issue Preclusion

The Double Jeopardy Clause protects individuals from being "twice put in jeopardy of life or limb" "for the same offence." U.S. Const. amend. V. "[O]nce a defendant is placed in jeopardy . . . and jeopardy terminates . . . the defendant may neither be tried nor punished a second time for the same offense." *Sattazahn v. Pennsylvania*, 537 U.S. 101, 106 (2003). The issue-preclusion, or collateral-estoppel, component of the Double Jeopardy Clause "preclude[s] prosecution of an offense when an issue of ultimate fact or an element essential to conviction has necessarily been determined in favor of the defendant by a valid and final judgment in a prior proceeding." *United States v. Cala*, 521 F.2d 605, 607–08 (2d Cir. 1975) (summarizing

---

[3] We review *de novo* a district court's decision on double jeopardy. *United States v. Olmeda*, 461 F.3d 271, 278 (2d Cir. 2006) (rulings on motions to dismiss indictment on double jeopardy grounds reviewed *de novo*). We review for abuse of discretion a district court's denial of a motion for a mistrial, its evidentiary rulings, and its ruling on reopening proceedings. *United States v. Deandrade*, 600 F.3d 115, 118 (2d Cir. 2010) (motion for mistrial); *United States v. Yannotti*, 541 F.3d 112, 120 (2d Cir. 2008) (evidentiary rulings); *United States v. Matsushita*, 794 F.2d 46, 52 (2d Cir. 1986) (reopening proceedings).

*Ashe v. Swenson*, 397 U.S. 436 (1970)). "The burden . . . is on the defendant in the second case to establish that the issue he seeks to foreclose from litigation . . . was necessarily decided in his favor by the prior verdict." *Id.* at 608.

Zemlyansky argues that collateral estoppel precludes the Government from predicating a RICO conspiracy charge on acts mirroring earlier substantive and conspiracy acquittals.[4] Because none of the earlier acquittals necessarily decided an essential element of RICO conspiracy in his favor, we disagree. Furthermore, the District Court did not err in permitting the Government to reuse evidence from the first trial to prove Zemlyansky's guilt in the second because the evidence was used to prove different, non-precluded conduct.

### A. The Government Was Not Precluded from Using Acquitted Substantive Offenses as Racketeering Predicates in the Second RICO Conspiracy Charge

Zemlyansky first contends that his acquittals of substantive counts of insurance-related mail fraud and money laundering at his first trial precluded the Government from predicating his RICO conspiracy charge on conduct mirroring

---

[4] Zemlyansky also argues that the Government placed him in double jeopardy by charging him with the same RICO conspiracy at his second trial as was charged at his first. However, even if the charges overlapped as he alleges, the first jury did not reach a verdict on the RICO conspiracy count, and a "jury's inability to reach a verdict [is] a nonevent that does not bar retrial." *Yeager v. United States*, 557 U.S. 110, 118 (2009).

11

those same counts at the second trial.[5] He argues that the District Court therefore erred when it denied his request to dismiss the RICO conspiracy count before the second trial. We disagree.

As a general matter, a jury's finding that a defendant did not commit certain substantive crimes does not necessarily preclude the government from later proving that he or she knowingly agreed to facilitate a racketeering scheme involving, or intended to involve, the same substantive crimes. *See Salinas v. United States*, 522 U.S. 52, 65 (1997) (holding that RICO's conspiracy provision "does not . . . excuse from [its] reach . . . an actor who does not himself commit . . . the two or more predicate acts requisite to the underlying offense"). So it is in this case. Substantive mail fraud and money laundering require proof that the defendant *committed* those offenses. *See* 18 U.S.C. §§ 1341, 1956–57. In contrast, RICO's conspiracy provision proscribes a defendant's knowing *agreement* to a racketeering scheme. "[A] conspirator charged with racketeering conspiracy need not commit or even agree to commit the predicate acts that are elements of a substantive count to be found guilty . . . , for 'it suffices that he adopt[ed] the goal

---

[5] The five charged predicate acts included: insurance- and securities-related mail fraud; insurance- and securities-related wire fraud; insurance- and securities-related money laundering; securities fraud; and illegal gambling.

12

of furthering or facilitating the criminal endeavor.'" *United States v. Ciccone*, 312 F.3d 535, 542 (2d Cir. 2002) (alteration in original) (quoting *Salinas*, 522 U.S. at 65). That Zemlyansky did not personally commit (either directly or as an accomplice) the substantive offenses in no way precludes a finding that he knowingly entered into an agreement in which such offenses were contemplated. As such, the first jury did not necessarily find RICO conspiracy's essential element of agreement in Zemlyansky's favor when it acquitted him of substantive mail fraud and money laundering.

### B. The Government Was Not Precluded from Using Acquitted Non-RICO Conspiracy Offenses as Racketeering Predicates in the Second RICO Conspiracy Charge

Zemlyansky next argues that the Government may not predicate a RICO conspiracy charge on acquitted conspiracy counts from a previous trial. At his first trial, Zemlyansky was acquitted of "basic" conspiracies to commit insurance-related mail fraud and money laundering. At his second trial, the expanded RICO conspiracy count listed insurance-related mail fraud and money laundering as predicate acts. While this is a closer call, we again disagree. We come to this conclusion by comparing the elements of "basic" and RICO conspiracy charges—in particular, how those elements differ as a result of the distinct objects of each.

13

The "basic" conspiracies at issue here require proof of: (1) an agreement between at least two people to commit an unlawful act, and (2) the defendant's knowing engagement in the conspiracy with the specific intent that the object of the conspiracy be committed. *See United States v. Mahaffy*, 693 F.3d 113, 123 (2d Cir. 2012); *see also United States v. Roy*, 783 F.3d 418, 421 (2d Cir. 2015) (per curium) (no overt act requirement for conspiracy under 18 U.S.C. § 1349); *Whitfield v. United States*, 543 U.S. 209, 214 (2005) (no overt act requirement for money laundering conspiracy, 18 U.S.C. § 1956(h)).

RICO conspiracy requires proof that the defendant "agree[d] to conduct or to participate in the conduct of [an] enterprise's affairs through a pattern of racketeering activity." *United States v. Pizzonia*, 577 F.3d 455, 462 (2d Cir. 2009). To prove the agreement element, the government must show that the defendant "knew about and agreed to facilitate [a racketeering] scheme." *Salinas*, 522 U.S. at 66; *see also Pizzonia*, 577 F.3d at 459 ("[T]he object of a racketeering conspiracy is to conduct the affairs of a charged enterprise through a pattern of racketeering, not to commit discrete predicate acts."). To prove the pattern element, the government must show that two or more "predicate acts were, or were intended to be, committed as part of [the] conspiracy." *United States v. Cain*, 671 F.3d 271, 291 (2d

14

Cir. 2012) (quoting *Yannotti*, 541 F.3d at 129 n.11). As we have already observed, the government need not establish that the defendant "committed or agreed to commit two predicate acts himself." *Salinas*, 522 U.S. at 63. Rather, the government may prove the pattern element through evidence that "the co-conspirators, not solely the defendant, agreed to conduct the affairs of the enterprise through a pattern of racketeering." *Yannotti*, 541 F.3d at 129 n.11. In short, RICO conspiracy requires proof: (a) of an agreement to join a racketeering scheme, (b) of the defendant's knowing engagement in the scheme with the intent that its overall goals be effectuated, and (c) that the scheme involved, or by agreement between any members of the conspiracy was intended to involve, two or more predicate acts of racketeering.

A comparison of "basic" and RICO conspiracy makes clear that acquittal of the former does not compel the conclusion that a jury necessarily decided an essential element of the latter in Zemlyansky's favor. Unlike "basic" conspiracy, RICO conspiracy does not require proof that a defendant knowingly agreed to facilitate a specific crime (*e.g.*, mail fraud). So long as the defendant knowingly agreed to facilitate "the general criminal objective of a jointly undertaken [racketeering] scheme," *Yannotti*, 541 F.3d at 122, the government need not prove

15

that he or she knowingly agreed to facilitate any specific predicate act. Similarly, unlike "basic" conspiracy, RICO conspiracy does not require proof that the defendant intended that specific criminal acts be accomplished. Instead, it suffices to show that he intended that the broad goals of the racketeering scheme be realized, along with evidence that some (or any) members of the conspiracy intended that specific criminal acts be accomplished.[6] RICO conspiracy and "basic" conspiracy thus have qualitatively different *mens rea* requirements as to agreement and intent.[7] A jury's finding that a defendant did not conspire to

---

[6] Though in many cases, evidence that the defendant agreed to further two specific predicate acts satisfies both the agreement and patter elements, proving RICO conspiracy in this manner is not required. RICO conspiracy could, for example, be proven by evidence that the defendant agreed to facilitate a scheme by providing tools, equipment, cover, or space; that the facilitation was knowing because the defendant was aware of the broader scheme, even if he was unaware of the particulars, or because the defendant knowingly benefitted from the scheme; and that other members of the enterprise intended to accomplish specific predicates.

[7] That RICO conspiracy has a more removed *mens rea* requirement comports with the purposes for which RICO was enacted. RICO was to intended address the deliberately aloof positioning of organized crime leaders, who "buffer[ed]" themselves from the lower tiers of criminal conduct "to maintain insulation from the investigative procedures of the police." S. Rep. No. 91-617, at 37; *id.* at 42 ("Organized crime leaders moreover, have been notoriously successful in escaping punishment . . . ."). RICO reflects this legislative concern by criminalizing an individual's indirect participation in, or conducting of, a racketeering enterprise. 18 U.S.C. § 1962(c); Organized Crime Control Act of 1970, Pub. L. 91-452, § 904(a), 84 Stat. 941, 947 (1970) ("The provisions of this title shall be liberally construed to effectuate its remedial purposes."); *see also, e.g.*, 116 Cong. Rec. S585, 586 (1970) (Sen. McClellan's remarks introducing bill) ("[T]he most serious aspect of the challenge that organized crime poses to our society is the degree to which

commit a particular predicate act does not necessarily preclude a subsequent finding that he or she knowingly agreed to facilitate a racketeering scheme that involved, or was intended to involve, that same predicate act.

Having thus determined in the abstract that an acquittal on "basic" conspiracy does not in all cases preclude a subsequent trial for RICO conspiracy predicated upon the same conduct, we must now determine whether a retrial was permissible in Zemlyansky's case. The question we must answer is whether a "rational jury" could have acquitted Zemlyansky in the first trial for similar, non-preclusive reasons. *See Ashe*, 397 U.S. at 444. We determine what a rational jury could have done by examining the record of the prior proceeding "in a practical frame and viewed with an eye to all [of its] circumstances." *Id.* (quoting *Sealfon v. United States*, 332 U.S. 575, 579 (1948)). This inquiry is "realis[tic] and rational[]," not "hypertechnical and archaic"; we evaluate the evidence in light of what was proven at trial and will not contort the analysis to find that a jury could have based its decision on alternate grounds when it clearly did not. *Id.* & n.9.

---

its members have succeeded in placing themselves above the law."); 116 Cong. Rec. S600, 602 (1970) (remarks of Sen. Hruska) (explaining that Title IX was "designed to remove the influence of organized crime from legitimate business by attacking its property interests and by removing its members from control of legitimate businesses"); S. Rep. No. 91-617, at 79 (noting that RICO was targeted at "individuals" and "the economic base through which those individuals constitute such a serious threat").

17

The record from the first trial makes clear that a rational jury could have grounded its "basic" conspiracy acquittals on reasons not essential to proving the later RICO conspiracy. For instance, the first jury could have found there was a conspiracy by individuals other than Zemlyansky to commit insurance-related mail fraud, while acquitting him on that count because he did not knowingly and intentionally agree to facilitate that particular conspiracy. Indeed, in acquitting Zemlyansky the jury could have found that he took great care to avoid agreeing to facilitate any specific "basic" conspiracies. Zemlyansky has acknowledged that his defense at the first trial was that, although he was involved in the P.C.s, he merely managed them in good faith, had nothing to do with patient care, and did not join any specific unlawful agreements with respect to their operation. The Government in the first trial also emphasized Zemlyansky's removed role in the no-fault insurance scheme, which might well have facilitated this jury finding. *See, e.g.*, Joint App. 313 (Tr. 4290) (describing Zemlyansky and Danilovich as operating "behind the scenes"). Thus, the second jury was not precluded from finding that Zemlyansky agreed to further the no-fault insurance scheme, notwithstanding the first jury's determination that he did not conspire to commit specific predicate acts.

Similarly, even if the first jury found that Zemlyansky's removed role left doubt as to whether he intended that specific crimes be committed, Zemlyansky could still be found guilty of RICO conspiracy if his co-conspirators had the requisite intent. This possibility exists because the first jury deadlocked as to whether two co-defendants in the first trial conspired to commit mail fraud and money laundering. The Government was, therefore, free to prove the pattern element through evidence that Zemlyansky's co-conspirators intended that the mail fraud and money laundering predicates be committed, even if Zemlyanksy lacked specific intent as to those individual predicates.

In acquitting Zemlyansky of the "basic" conspiracy counts, the first jury did not necessarily decide that he did not knowingly agree to further the no-fault insurance scheme or that the pattern of racketeering did not exist. As a result, the Government was not precluded from predicating the second RICO conspiracy count upon the insurance-related "basic" conspiracies of which Zemlyansky had earlier been acquitted.

### C. The District Court Properly Admitted Evidence from the First Trial Because the Evidence Was Used for Different, Non-precluded Purposes in the Second Trial

Furthermore, we find no error in the District Court's decision to permit the Government to introduce evidence from the first trial to prove Zemlyansky's guilt

19

in the expanded RICO conspiracy charge. Although there are instances in which acquittal of an offense bars re-use of evidence related to that offense in a later trial, preclusion requires a showing by the defendant that the government seeks to reuse the evidence for the specific purpose of proving conduct of which he was previously acquitted. Zemlyansky has not met his burden.

In *United States v. Mespoulede*, 597 F.2d 329 (2d Cir. 1979), on which Zemlyansky relies, the defendant was acquitted of possessing cocaine with the intent to distribute. *Id.* at 332. In a second trial, the government offered evidence of the defendant's cocaine possession to prove he conspired to distribute the drug. *Id.* On appeal the defendant argued that the government should have been precluded from introducing evidence of his possession in the second trial when the first jury had necessarily resolved the question of possession in his favor. *Id.* We agreed, rejecting the government's contention that issue preclusion applies only "where the issue sought to be excluded is a Sine qua non of conviction in the second trial." *Id.* at 334. Instead, the issue-preclusion component of double jeopardy protects the defendant from "defend[ing] against charges or factual allegations that he overcame in the earlier trial, just as if that trial had never taken place." *Id.* at 335 (internal citation omitted). Thus, although the government is free

20

"to charge a defendant with new crimes arising out of the same conduct, . . . '[it may] not prove the new charge by asserting facts necessarily determined against it on the first trial.'" *Id.* at 334 (quoting *United States v. Kramer*, 289 F.2d 909, 916 (2d Cir. 1961) (Friendly, *J.*)).

*Mespoulede* teaches that *Ashe*'s issue-preclusion paradigm protects defendants from the government's relitigation of even those issues that are not essential to conviction in the later trial, as long as those issues were "necessarily determined" in the defendant's favor in a prior proceeding. *Id.* at 334–35; *see also Kramer*, 289 F.2d at 915–16; *cf. Dowling v. United States*, 493 U.S. 342, 348–49 (1990) (issue preclusion inapplicable where issue presented in a subsequent trial is governed by a lower standard of proof). But to warrant this protection, a defendant must prove that the issue he seeks to preclude was, in fact, decided in his favor.

Here, Zemlyansky argues that it would have been error for the District Court to permit the Government to prove that he joined the no-fault insurance scheme by reference to evidence that he committed, or conspired to commit, mail fraud and money laundering.[8] We agree with Zemlyansky on this point. But, as

---

[8] To the extent Zemlyanksy argues that the Government could not re-use *any* evidence concerning the No-Fault Insurance Organization in the second trial, he is mistaken. *Mespoulade* bars use of evidence only to prove issues or facts necessarily decided against the government, not to prove any and all issues.

21

discussed above, evidence that Zemlyansky committed or conspired to commit the predicate acts was not the only way of proving that he agreed to facilitate the no-fault insurance scheme.

Rather, the Government argued that Zemlyansky knowingly facilitated the no-fault insurance scheme by providing physical space (the P.C.s); recruiting doctors to serve as so-called paper owners of the clinics; and paying employees to manage clinics in which he knew, based on the outsized monetary benefits he derived from the clinics, that the employees/co-conspirators carried out a scheme of insurance fraud. The Government similarly did not attempt to prove up the pattern element with evidence that Zemlyansky committed, or conspired to commit, mail fraud and money laundering, but instead introduced evidence that his co-conspirators satisfied that requirement.

Thus, because the Government did not seek to establish any element of RICO conspiracy by reusing evidence to prove an issue previously determined in Zemlyansky's favor, but instead relied on separate, non-precluded evidence to prove each element, the District Court did not err by permitting the Government to introduce evidence from Zemlyansky's first trial.

22

## II. Prosecution's Rebuttal Summation Comments

Zemlyansky next argues that the District Court's failure to declare a mistrial and reopen proceedings in light of the prosecution's commentary on his courtroom demeanor violated his Fifth and Sixth Amendment rights. We hold that although the prosecuion's comments were improper, the District Court took prompt and appropriate action to ensure that Zemlyansky was not substantially prejudiced by the misconduct.

At the second trial, the Government sought to establish Zemlyansky's involvement in the investment schemes in part through a recording of a telephone conversation between an agent of the Alabama Securities Commission and a Lyons Ward employee, "Bob Hamilton." The recording reflected "Bob Hamilton" repeatedly and falsely claiming that Lyons Ward was a legitimate investment company. At trial, three government witnesses testified that "Bob Hamilton" was Zemlyansky. During the testimony of one of these witnesses, Zemlyansky cried for five to ten minutes—observed by at least some members of the jury—in what the District Court later described as a "noticeable" but "not audible" manner. Joint App. 532. Zemlyansky did not testify at trial.

In rebuttal summation to the jury, the prosecutor mentioned Zemlyansky's crying:

> So what happens next? After [the witness] identifies Mikhail Zemlyansky's voice on that recording, the defendant breaks down and starts crying in open court at that table. And I looked over at you and I know you all saw that. And why was he doing that?

*Id.* at 511.

Defense counsel objected, and after a brief side bar, the Court overruled the objection and ordered that the prosecutor move on. The prosecutor continued:

> When the third person identifies the voice of Bob [Hamilton] on the witness stand, the defendant knows that the game is up. All of his efforts to stay above the fray—the fake names, the paper owners, the prepaid phones—have all come crumbling down. He is Bob Hamilton, the voice behind Lyons Ward. So what does he do? He makes a last-ditch effort, desperate effort, to perpetuate the fraud.

*Id.* at 514–15.

The following morning, the District Court heard additional argument on these comments. Defense counsel moved for a mistrial, to reopen the proceedings for defense counsel to testify on the reason for Zemlyansky's demeanor, or, as a third option, for a curative instruction. The court found the comments improper but ruled they were not prejudicial enough to warrant a mistrial. The court noted that the comments "did not actually ask the jury to make an inference," were

24

circumscribed by immediate objection, and were of limited effect given that "it is likely that most or all of the jurors noticed [the crying]." *Id.* at 549. Wary of drawing unnecessary attention to the matter, the court also denied Zemlyansky's motion to reopen the proceedings, stating that a curative instruction would be sufficient. The court issued the instruction in advance of jury deliberations, after both parties agreed on its content.[9]

The Fifth Amendment provides in relevant part that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To establish a Fifth Amendment violation of the right against self-incrimination, a defendant must show that his statement or act: (1) was compelled, (2) was testimonial, and (3) incriminated him in a criminal proceeding. *United*

---

[9] The District Court issued the following instruction:

> "[Y]esterday afternoon during his rebuttal summation, counsel for the government said that the defendant had been crying at one point during the trial and defense counsel objected. Upon consideration, I now sustain the objection to those comments, which were improper, and order them stricken. There may be any number of reasons why the defendant may have been crying, and you must disregard any comments about that by counsel. You are to consider only the evidence that has been admitted, including the sworn testimony of witnesses, but that does not include the defendant's demeanor during this trial.

*Id.* at 552.

*States v. Hubbell*, 530 U.S. 27, 34 & n.8 (2000); *In re Grand Jury Subpoena*, 826 F.2d 1166, 1168 (2d Cir. 1987).

Zemlyansky's behavior was neither compelled nor testimonial. Determining whether communication was compelled requires looking to the circumstances of the communication's creation; the government's unilateral use of a communication does not make it compelled. *Fisher v. United States*, 425 U.S. 391, 409–10 (1976) (subpoenaed papers not compelled testimonial evidence); *In re Grand Jury Subpoena Duces Tecum Dated Oct. 29, 1992*, 1 F.3d 87, 93 (2d Cir. 1993). Like an "act . . . exhibiting [certain] physical characteristics," spontaneous crying is "not the same as a sworn communication by a witness that relates either express or implied assertions of fact or belief." *Hubbell*, 530 U.S. at 35.[10]

Zemlyansky additionally argues that his Sixth Amendment rights to confrontation and counsel were violated. The Sixth Amendment provides in

---

[10] Zemlyansky also appears to argue that the prosecutor's comments infringed his right not to testify. Although a defendant's right against self-incrimination also can be violated when a prosecutor comments on a defendant's failure to testify, the rebuttal comments here were not improper on that basis. *See Griffin v. California*, 380 U.S. 609, 615 (1965); *United States v. Knoll*, 16 F.3d 1313, 1323 (2d Cir. 1994) ("The test governing whether a prosecutor's statements amount to an improper comment on the accused's silence in violation of the Fifth Amendment looks at the statements in context and examines whether they 'naturally and necessarily' would be interpreted by the jury as a comment on the defendant's failure to testify." (quoting *United States v. Bubar*, 567 F.2d 192, 199 (2d Cir. 1977))).

relevant part that "the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . and to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.

Zemlyansky contends he was deprived of the opportunity to cross-examine the prosecutor, who became a witness against him upon making the improper comments. The prosecutor was not a witness, however. This is not a case of the government placing its imprimatur on facts unobserved by the jury. The record reflects that Zemlyansky's behavior was readily noticeable by the jury, counsel for both parties, and the judge; thus, the prosecutor's comments were not factual observations warranting witness cross-examination.

The prosecution's comments also did not violate Zemlyansky's right to conflict-free counsel. Although there are cases where a prosecutor's actions require that defense counsel cease representation in order to testify on her former client's behalf, *see, e.g.*, *Ramchair v. Conway*, 601 F.3d 66, 73 (2d Cir. 2010), the comments here did not require that remedy. Nor did they divide defense counsel's loyalties or otherwise create a conflict of interest in his representation of Zemlyansky. *Cf. United States v. Curcio*, 680 F.2d 881, 889–90 (2d Cir. 1982).

Zemlyansky further argues that the prosecution's comments violated his due process rights to a fair trial by undermining his right "to have his guilt or innocence determined solely on the basis of the evidence introduced at trial." *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978). The Government concedes that the prosecutor's comments preceding defense counsel's objection were improper in this regard. Improper prosecutorial comments, however, do not always require vacating a conviction. *See United States v. Young*, 470 U.S. 1, 11 (1985).

"A prosecutor's improper summation results in a denial of due process when the improper statements cause substantial prejudice to the defendant." *United States v. Myerson*, 18 F.3d 153, 162–63 (2d Cir. 1994) (quoting *United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir. 1981) (per curium)); *see also United States v. Banki*, 685 F.3d 99, 120 (2d Cir. 2012) (examining record for prosecutorial misconduct that is "so severe and significant" as to deny right to fair trial (quoting *United States v. Locascio*, 6 F.3d 924, 945 (2d Cir. 1993))). In deciding whether a prosecutor's improper comments caused substantial prejudice, we view the improper statements in context, considering "[1] the seriousness of the misconduct, [2] the measures adopted by the trial court to cure the misconduct, and [3] the certainty of conviction absent the improper statements." *Banki*, 685 F.3d

at 120 (brackets in original) (quoting *United States v. Parker*, 903 F.2d 91, 98 (2d Cir. 1990)). We consider these factors to determine "whether the prosecutor['s] comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

The District Court acted within its broad discretion in denying Zemlyansky's motion for a mistrial for improper prosecutorial comments. Immediately after defense counsel's objection to the prosecutor's comments, the court permitted the parties to address the objection and then properly instructed the prosecutor to move on, which he did. As soon as possible thereafter, the court heard argument on the impropriety of the prosecutor's remarks and on the appropriate cure. After determining that the prosecutor had erred, the District Court reasonably concluded that the implications were limited and sensibly regarded a curative instruction as the best remedial route for moving past an issue inappropriate for the jury's consideration. The resulting instruction—a product of party collaboration—not only sustained Zemlyansky's objection, but also described the comments as improper and struck them; clarified that many inferences could be drawn from Zemlyansky's demeanor; and reminded the jurors

that they could consider only admitted evidence, which did not include Zemlyansky's courtroom demeanor.

Unlike in the out-of-circuit cases Zemlyansky cites, here the District Court not only immediately responded to the impropriety by directing the prosecution to move on, but it also later sustained the objection and gave a strong curative instruction.[11] And unlike in those cases, the prosecutor was, we conclude here, not a character witness. He therefore did not implicate Zemlyansky's Sixth Amendment confrontation rights.

The District Court's remedial measures were particularly appropriate when viewed in context of the trial. There is no indication the prosecutor intended the comments to prejudice Zemlyansky's case; multiple witnesses corroborated the "Bob Hamilton" identification; and there was a mountain of other evidence—bank records, witness testimony, etc.—with respect to not one but two investment fraud

---

[11] *Cf. United States v. Schuler*, 813 F.2d 978, 981 (9th Cir. 1987) ("[I]n the absence of a curative instruction from the court, a prosecutor's comment on a defendant's off-the-stand behavior constitutes a violation of the due process clause of the fifth amendment."); *United States v. Carroll*, 678 F.2d 1208, 1210 (4th Cir. 1982) ("By allowing the prosecutor's remarks to pass uncorrected, over defense counsel's objection, for a not-inconsiderable period of time, the district court implied that the remarks were unobjectionable."); *United States v. Wright*, 489 F.2d 1181, 1185–86 (D.C. Cir. 1973) (finding error in a prosecutor's comment that defendant found the trial humorous and in prosecution's instruction to the jury, made with the district court's approval, that it could "definitely consider [the defendant's] demeanor in [its] deliberations").

schemes. The impropriety was isolated, minimized, and anomalous in an otherwise uneventful trial. *United States v. Elias*, 285 F.3d 183, 191 (2d Cir. 2002) ("[T]he severity of the misconduct is mitigated if the misconduct is an aberration in an otherwise fair proceeding."). The District Court therefore did not err in addressing the prosecutor's closing comments as events unfolded and in denying Zemlyansky's motions for a mistrial and to reopen proceedings.

## III. The Transcript

Finally, Zemlyansky maintains that the District Court abused its discretion and deprived him of his Sixth Amendment right to a fair trial by admitting into evidence and allowing into jury deliberations a transcript that identified him as the speaker. The District Court, however, acted within its discretion.

At trial, the Government sought to publish to the jury a transcript of the "Bob Hamilton" audio recording. The transcript's unredacted cover page indicated that Zemlyansky was a participant in the conversation. Defense counsel stipulated to the accuracy of the record but contested that Zemlyansky was a conversation participant. The court admitted the transcript "subject to connection"—that is, subject to the Government offering evidence that the voice attribution was accurate—and gave a corresponding limiting instruction to the

31

jury to that effect. The court later allowed the transcript into the jury deliberation room, but only after instructing the jury that the transcript was not evidence but an aid, and that it was for them alone "to decide whether the transcripts correctly present the conversations recorded on the tapes." Joint App. 554.

By proffering the testimony of three witnesses identifying Zemlyansky's voice on the recording, the Government offered sufficient evidence of identification for the recording to be admitted. *See* Fed. R. Evid. 104(b). The District Court therefore did not err in allowing the transcript to serve as a jury aid with respect to the properly-admitted recording.

For similar reasons, the District Court also did not err in allowing the transcript to be reviewed by the jury during its deliberations. *See United States v. Rosa*, 17 F.3d 1531, 1548 (2d Cir. 1994). Although the District Court did not explicitly charge the jury as to the transcript's disputed voice attribution, it clearly stated that the transcript was merely an aid and was not guaranteed to be accurate. *See United States v. Ulerio*, 859 F.2d 1144, 1146 (2d Cir. 1988) (finding no jury instruction necessary where jury "was well aware of" defendants' disagreement with voice attributions made by government). The District Court's earlier limiting instruction informed the jury that Zemlyansky disagreed with the transcript's

identification of him and that the transcript had been prepared by the Government. And Zemlyansky made clear that he disputed the transcript's voice attribution; his sole witness testified that his voice was not on the recording. For these reasons, no further explicit instruction on the transcript's contested voice attribution was necessary.

## IV.    Cumulative Error

As foreshadowed by the above, we reject Zemlyansky's cumulative error argument. "[T]he cumulative effect of a trial court's errors, even if they are harmless when considered singly, may amount to a violation of due process requiring reversal of a conviction." *United States v. Al-Moayad*, 545 F.3d 139, 178 (2d Cir. 2008). Notwithstanding the prosecution's improper remarks, the evidence against Zemlyansky was overwhelming and the cumulative impact of the improper commentary does not rise to the level of a due process violation. *See United States v. Hurtado*, 47 F.3d 577, 586 (2d Cir. 1995)

## CONCLUSION

For these reasons, we **AFFIRM** the judgment of the District Court.