19-958 (L)
*United States v. Ketabchi, et al.*

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

# SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007 IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 21st day of October, two thousand twenty.

PRESENT:
> JOHN M. WALKER, JR.,
> GUIDO CALABRESI,
> SUSAN L. CARNEY,
> *Circuit Judges.*

───────────────────────────────────────

UNITED STATES OF AMERICA,

> *Appellee,*


> v.                                        Nos. 19-958, 19-988

SHAHRAM KETABCHI, ANDREW OWIMRIN, ALSO KNOWN AS ANDREW OWENS, ALSO KNOWN AS JONATHAN STEWART,

> *Defendants-Appellants,*


ARASH KETABCHI, ALSO KNOWN AS ZACH PETERSON, WILLIAM SINCLAIR, MICHAEL FINOCCHIARO, ALSO KNOWN AS MICHAEL FOSTER, JOSEPH MCGOWAN, CHRISTOPHER WILSON, ALSO KNOWN AS ERIC FIELDS, JACK KAVNER, ALSO KNOWN AS BOB WILEY, ALSO KNOWN AS PHIL POWERS, DANIEL QUIRK, ALSO KNOWN AS LOU EPSTEIN, ALSO KNOWN AS HUCKABEE,

ALSO KNOWN AS JOSH NEWMAN, PETER DIQUARTO,
THOMAS O'REILLY, RAYMOND QUILES, BROOK MARCUS,
ALSO KNOWN AS EMILY MILLER,

      *Defendants.*[*]

_____

| | |
|---|---|
| FOR DEFENDANTS-APPELLANTS: | DANIEL M. PEREZ, Newton, NJ (for Sharam Ketabchi); BEVERLY VAN NESS, New York, NY (for Andrew Owimrin). |
| FOR APPELLEE: | ROBERT B. SOBELMAN (Benet J. Kearney, Kiersten A. Fletcher, Won S. Shin, *on the brief*), Assistant United States Attorney, *for* Audrey Strauss, Acting United States Attorney for the Southern District of New York, New York, NY. |

Appeal from judgments of the United States District Court for the Southern District of New York (Stein, *J.*).

**UPON DUE CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment entered on April 8, 2019, and the amended judgment entered on August 27, 2019, are **AFFIRMED**.

Sharam Ketabchi and Andrew Owimrin appeal, respectively, from judgments of conviction entered on April 8, 2019, and August 27, 2019, following a jury trial in the United States District Court for the Southern District of New York (Stein, *J.*).[1] Ketabchi and Owimrin were each convicted of one count of conspiracy to commit fraud, in violation of 18 U.S.C. § 1349, and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), in connection with their roles in a telemarketing fraud scheme. For

_____

[*] The Clerk of Court is directed to amend the caption to conform to the above.

[1] On June 8, 2020, based on his appeal waiver, a panel of this Court dismissed Arash Ketabchi's consolidated appeal (No. 19-1079) from a judgment entered against him on April 8, 2019, in related criminal proceedings.

those crimes, Ketabchi was sentenced principally to serve four months of incarceration followed by three years of supervised release and to pay a forfeiture of $100,000 and restitution of $557,991. Owimrin was sentenced principally to serve 52 months of incarceration followed by three years of supervised release and to pay a forfeiture of $30,825, and restitution of $563,427.99.

We assume the parties' familiarity with the underlying facts, procedural history, and arguments on appeal, to which we refer only as necessary to explain our decision to affirm the judgments.

1. Ketabchi: sufficiency challenge

On appeal, Ketabchi contends that the evidence admitted at trial was not sufficient for a jury to conclude beyond a reasonable doubt that he knew of the fraudulent nature of the scheme, a required element of both conspiracy counts. *See United States v. Zemlyansky*, 908 F.3d 1, 10 (2d Cir. 2018) (conspiracy to commit wire fraud and to commit money laundering require proof of a defendant's "knowing engagement in the conspiracy with the specific intent that the object of the conspiracy be committed."); *United States v. Lorenzo*, 534 F.3d 153, 160 (2d Cir. 2008) ("To sustain a conspiracy conviction, the government must present some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it.").[2] Ketabchi unsuccessfully moved for a judgment of acquittal on this ground at the close of the Government's case. Because Ketabchi did not renew the motion at the close of the defense case, our precedent instructs that we review the District Court's denial of the motion for "plain error or manifest injustice" only. *United States v. Finley*, 245 F.3d 199, 202 (2d Cir. 2001).

A defendant who mounts a sufficiency challenge bears a "heavy burden" because this Court "must view the evidence in the light most favorable to the government, crediting

---

[2] Unless otherwise noted, in quotations from caselaw, this Order omits all alterations, brackets, citations, emphases and internal quotation marks.

3

every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Aquart*, 912 F.3d 1, 17 (2d Cir. 2018). "A court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004). The burden is heavy even where we are not reviewing the District Court's denial of a motion for acquittal for plain error only.

In light of the record here, we conclude that Ketabchi has not carried his burden. At trial, the jury heard evidence that Ketabchi worked with his brother and co-defendant, Arash Ketabchi, on one of the latter's fraudulent telemarketing companies, A1 Business Consultants ("A1"). A1 was one of several entities involved in a broader telemarketing fraud scheme orchestrated in part by Arash. Telemarketers at these entities sold "business opportunities" and accompanying products and services to elderly customers, and misleadingly claimed that that the customers would make significant profits from the investments. In reality, as co-conspirator William Sinclair testified, the businesses were not operational and did not have any "structure," so "nobody made money." Ketabchi App. 64. Nor would customers receive the products and services for which they had paid.

Ketabchi's role was to fight "chargebacks," or victims' disputes of the legitimacy of A1's charges through their credit card companies. This role was critical because banks would otherwise shut down A1's "merchant accounts"—the bank accounts through which A1 processed victim payments—after too many chargebacks. Indeed, the scheme operated several entities, including A1 and another called Olive Branch, in order to ensure the availability of merchant accounts. As Sinclair testified, "the business model . . . all c[ame] down to merchant accounts. Merchant accounts is [sic] what allowed us to make money." Supp. App. 52.

The evidence from which a jury could infer that Ketabchi knew that A1 was fraudulent and that he intended for both the fraud and related money laundering operation to succeed was substantial. Among other things, in attempting to stop a search of his home

4

in the investigation leading to this prosecution, Ketabchi lied to federal agents, saying that he had "nothing to do with his brother's [Arash's] businesses." Supp. App. 93. A reasonable jury could infer that Ketabchi lied precisely because he understood A1's criminal nature.

Also, in private electronic messages, Ketabchi strategized with Arash about how to avoid creating suspicions about A1 in their banks and customers. For example, after learning that A1 was on a "blacklist" that prevented it from obtaining domestic merchant accounts, Ketabchi proposed that A1 use international accounts instead. Supp. App. 100-01. Arash and Ketabchi discussed not transferring scheme proceeds between Bank of America accounts, since the bank would "link and shut [the accounts] down," just as Wells Fargo had done with a different account. Supp. App. 30. Ketabchi further suggested that they not post toll-free phone numbers or physical addresses associated with A1 on the website of a public-facing shell company, explaining that if customers "search, they will see the link [to A1, and the company would be a] no go." Supp. App. 97. The website needed to "show legitimacy," Ketabchi declared. Supp. App. 99.

Significant external communications to which he was privy also alerted Ketabchi to A1's wrongdoing. A merchant account representative warned of the numerous "red flags" in A1's chargebacks, of the fact that A1's "account was ordered closed by MasterCard," and that A1 had caused the merchant account company to misrepresent to a bank that A1 was "completely separate" from another entity in the scheme. Supp. App. 14, 70-71. As the representative challenged Ketabchi, "Can you please show me where on your website these products and services [at issue in a chargeback] are offered? I would say your likelihood of winning and keeping the funds for these disputes is slim to none." Supp. App. 14. Ketabchi also possessed letters that detailed complaints of fraud lodged on behalf of customers by state attorneys general and a New Jersey public safety office. Even after receiving these complaints, Ketabchi vigorously fought the chargebacks related to these customers and described one customer's account as "100% false" in a letter to a credit card company signed by Arash. Supp. App. 7. Taken together with other similar communications in evidence, the evidence was more than sufficient for a jury to conclude that Ketabchi knew about the

fraudulent scheme and money laundering, and indeed, worked hard to ensure that both succeeded despite significant obstacles.

Ketabchi's arguments to the contrary are unavailing. He argues that no reasonable jury could impute knowledge to him because the evidence showed that his role was ministerial and he simply followed Arash's lead. In Ketabchi's narrative, the evidence presented at trial is consistent with his *lack* of knowledge. He points out that he never acted as a salesperson for A1; he asserts that the A1 chargeback rate was not unreasonable; and he notes that he benefited less from the scheme than did other co-conspirators.

But these arguments miss the point of review for sufficiency of the evidence after a well-instructed jury has convicted. Regardless of whether the evidence is amenable to an interpretation in Ketabchi's favor, this Court must review the evidence in the light most supportive of the verdict. The jury here did not credit the inferences that Ketabchi advances and chose instead to believe alternative inferences advanced by the Government. Upon full consideration of the record, we decide that a rational jury could comfortably conclude that Ketabchi acted with knowledge and intent given the evidence before it. No more is required. *See United States v. Abelis*, 146 F.3d 73, 80 (2d Cir. 1998) (the Government need not "disprove every possible hypothesis of innocence," but simply show that a verdict should be sustained based on the "evidence as a whole" viewed "in the light most favorable to" the Government).

We therefore affirm Ketabchi's judgment of conviction.

2. Owimrim: sentencing challenges

Owimrin, a salesperson for Olive Branch and A1, appeals only from the sentence imposed on him by the District Court. He contends that it is procedurally and substantively unreasonable. Neither argument succeeds.

We apply "a particularly deferential form of abuse-of-discretion review" in the sentencing context. *United States v. Cavera*, 550 F.3d 180, 188 n.5(2d Cir. 2008) (en banc). A sentence is procedurally unreasonable when it "fails to calculate (or improperly calculates)

6

the Sentencing Guidelines range, treats the Sentencing Guidelines as mandatory, fails to consider the § 3553(a) factors, selects a sentence based on clearly erroneous facts, or fails adequately to explain the chosen sentence." *United States v. Jesurum*, 819 F.3d 667, 670 (2d Cir. 2016). A sentence is substantively unreasonable "only in exceptional cases where the trial court's decision cannot be located within the range of permissible decisions." *Cavera*, 550 F.3d at 189; *see also United States v. Rigas*, 583 F.3d 108, 123 (2d Cir. 2009) (explaining that substantive reasonableness review "provide[s] a backstop for those few cases that, although procedurally correct, would nonetheless damage the administration of justice because the sentence imposed was shockingly high, shockingly low, or otherwise unsupportable as a matter of law").

a.      *Procedural reasonableness*

Owimrin submits that the District Court erred by not applying a two-point reduction to his offense-level calculation, asserting that he was a "minor" participant in the scheme under the standards established by U.S.S.G. § 3B1.2. To secure such an adjustment, Owimrin must prove his entitlement to it by a preponderance of the evidence. *United States v. Colon*, 220 F.3d 48, 51 (2d Cir. 2000). On appeal, we "review[] the district court's determination as to the defendant's role for clear error, and reverse[] the district court's conclusion only for abuse of discretion." *Id.*

Section 3B1.2 defines a "minor" participant as one who is "less culpable than most other participants in the criminal activity, but whose role could not be described as minimal [which qualifies for a four-level reduction]." U.S.S.G. § 3B1.2 cmt. n.5.  The minor participant determination is based on the "totality of circumstances," *id.* n.3. These may include:

(i)      the degree to which the defendant understood the scope and structure of the criminal activity;

(ii)     the degree to which the defendant participated in planning or organizing the criminal activity;

(iii)    the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv)    the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; [and]

(v)    the degree to which the defendant stood to benefit from the criminal activity.

U.S.S.G § 3B1.2 cmt. n.3(C).

The District Court's conclusion that Owimrin did not carry this burden, and instead was an average participant in the scheme, is eminently reasonable. The court focused on the following factors: the nature and degree of Owimrin's participation in the scheme; the particular acts that he performed; and the extent of his decision-making authority relative to that of other participants. It recognized Owimrin as standing at "the core of the criminal activity," because "salesmen are the workhorses of this operation." Owimrin App. 183. Salespeople lured the victims to the scheme by nurturing relationships with them and making them attractive false promises. Although Owimrin was not as culpable as leaders of the scheme like Arash and Sinclair, he was still more culpable than some participants, such as the "appointment setters" and "secretaries," who simply routed "all the calls" to the salespeople. Owimrin App. 183-84, 187. As the court summarized at the end of its colloquy with Owimrin and his counsel on its relevant Guidelines calculation: "There's no question that [Owimrin] was an active salesperson here. He was important . . . . Was he following directions of Arash? Yes. But he still was defrauding people. And he knew what he was doing." Owimrin App. 190-91.

The trial record reinforces the District Court's conclusion. For two years, Owimrin was an active salesperson for Olive Branch and A1 and knowingly carried out the fraud. He developed strategies like targeting the same victims multiple times by using different aliases and drawing on his knowledge of their susceptibilities. Not only did Owimrin persuade victims to buy fake businesses and products, he also helped some obtain new lines of credit to support their purchases in the scheme. As he described crassly to Arash, "I'll get [victim] today. I'll put at least 20 grand on a credit card." Supp. App. 3-4. The evidence suggests that Owimrin's acts were motivated by his commission-based compensation. Further, in addition

8

to making direct sales calls, Owimrin sometimes fought chargebacks. He also opened an LLC in his name to obtain a merchant account for the scheme. In light of all this evidence, it was not an abuse of discretion for the District Court to deny him a minor-role adjustment.

Owimrin attacks this conclusion, contending that the court improperly reasoned that defendants performing "essential" roles—like him, primarily a salesperson—cannot be less culpable than the "average" participant. But the transcript does not support this characterization of the District Court's reasoning. The District Court simply found that Owimrin's role as a salesperson was important and bore on, but was not decisive of, his relative level of culpability. Owimrin also argues that the court should not have compared his conduct to those of uncharged employees, such as the "appointment setters" and "secretaries." But the Sentencing Guidelines contain no such restriction. They define a "minor" participant relative to "other participants in the criminal activity," rather than only to those charged. To the extent that Owimrin argues that there was no evidence that these uncharged employees were involved in criminal activity and therefore could not be comparators, the court did not clearly err in finding that the evidence of their participation was sufficient.

Owimrin finally submits that the District Court erred by deeming him responsible for a loss amount that significantly exceeds the benefit he personally derived from the scheme. The court correctly observed that how successful Owimrin was in converting his pitches into commissions "is a separate question" from how "active," and thus, culpable he is. Owimrin App. 191. While the level of illegal success achieved may be probative of the level of a defendant's activity, the preponderance of the evidence did not establish that Owimrin was a minor participant in the fraudulent scheme. We reject Owimrin's claim of entitlement to a minor role adjustment.

b.      *Substantive reasonableness*

Owimrin next argues that his below-Guidelines sentence of 52 months was substantively unreasonable because the District Court gave "unwarranted short shrift" to his arguments for a lower sentence. This argument is meritless.

It is "difficult to find that a below-Guidelines sentence is unreasonable" where, in "the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable." *United States v. Perez-Frias*, 636 F.3d 39, 43 (2d Cir. 2011). Although the Guidelines recommended a sentence for Owimrim of 87 to 108 months, he received a sentence of 52 months, nearly three years lower than the bottom of the Guidelines range. The District Court reasonably granted this downward departure after considering all the relevant factors, including those that Owimrin now argues the court wrongly deemphasized: the nature of his role and conduct in the scheme, his extenuating personal circumstances, lack of criminal history and desire to reform, the need that the sentence reflect the devastation wrought on victims and be appropriate in light of co-defendants' sentences, and the types of sentences available by statute and under the Guidelines. To the extent that Owimrin is challenging the District Court's weighing of these factors, the "particular weight to be afforded aggravating and mitigating factors is a matter firmly committed to the discretion of the sentencing judge." *United States v. Broxmeyer*, 699 F.3d 265, 289 (2d Cir. 2012).  The District Court did not abuse its discretion in imposing the 52-month sentence.

c. *Restitution order*

Finally, Owimrin challenges the District Court's decision not to apportion restitution among Owimrin and his co-defendants, and instead to hold Owimrin jointly and severally liable with them for the whole restitution amount ($557,991). This challenge fails.

The Mandatory Victim Restitution Act (the "MVRA") requires that defendants pay restitution where "an identifiable victim or victims has suffered a physical injury or pecuniary loss" in the context of a property offense. 18 U.S.C.§ 3663A(c)(1)(B); *see United States v. Boyd*,

10

222 F.3d 47, 49 (2d Cir. 2000) (noting that the MVRA "provides for mandatory restitution in cases of telemarketing fraud"). If "more than 1 defendant has contributed to the loss of a victim, the court *may* make each defendant liable for payment of the full amount of restitution or *may* apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." 18 U.S.C.§ 3664(h) (emphasis added). This Court "review[s] an MVRA order of restitution deferentially, and [it] will reverse only for abuse of discretion." *United States v. Gushlak*, 728 F.3d 184, 190 (2d Cir. 2013).

The District Court acted well within the permissible bounds of its discretion in imposing this restitution obligation on Owimrin. The $557,991 total restitution is reasonably based on the losses of 30 victims whom Owimrin either defrauded himself or from whose payments he directly benefited. Under 18 U.S.C.§ 3664(h), the court was authorized to require that Owimrin bear this entire amount.

Indeed, Owimrin does not challenge the accuracy or legality of this calculation per se, but argues primarily that the court should have fashioned the co-defendants' restitution obligations differently. He submits first that the court should have apportioned a lesser amount to him to reflect his lesser role in the scheme and his economic circumstances. But the MVRA plainly vests discretion in a court not to do so. In any case, the District Court disagreed with Owimrin's view that he was a lesser rather than average participant.

Owimrin further argues that he should not be responsible for loss amounts flowing from the sales made by his co-conspirators. But a court may include the amounts incurred by co-conspirators so long as these amounts are "reasonably foreseeable." *See Boyd*, 222 F.3d at 51. Owimrin focuses on the court's inclusion of losses caused by sales made by his cousin Reagan Owimrin and Arash Ketacbhi. Yet, these sales were entirely foreseeable to Owimrin, since he had an express agreement with Reagan to share commissions and he worked closely with Arash at both A1 and Olive Branch.

Owimrin argues finally that he should be responsible only for losses from sales that occurred after an unknown date when he became aware of the fraud. When a defendant joins a "conspiracy without reasonable knowledge of his co-conspirators' past activities, then he should not be held liable for the loss caused by those activities." *United States v. Bengis*, 783 F.3d 407, 413-14 (2d Cir. 2015). But a defendant is "jointly and severally liable for the losses caused by the conspiracy after he joined." *Id.* Owimrin points to no evidence and raises no argument showing that the restitution order sweeps in losses from "past activities" of which Owimrin had no "reasonable knowledge."

Indeed, the District Court's methodology in setting restitution suggests otherwise. In its final request leading to the restitution order, the Government sought to establish a loss amount of $979,710.56 attributable to 64 victims of Olive Branch and A1, and cited evidence that Owimrin reasonably foresaw all these losses because they flowed from his colleagues' known activities identical to his own. The District Court, however, chose to limit the restitution amount for Owimrin to the losses of 30 victims "directly" attributable to his activities, that is the victims whom Owimrin "directly" defrauded and from whom he "directly" benefited. Owimrin App. 168. An example of the latter are victims who contributed to the commissions that Owimrin and his cousin agreed to split. The loss amounts of such victims were reasonably foreseeable to Owimrin.

In any case, Owimrin's challenge focuses not on the loss amount per se, but on his full responsibility for it. On review, we conclude that the District Court did not abuse its discretion in declining to apportion liability. *See United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 99 (2d Cir. 2014) (holding that a court acts within its discretion in imposing a restitution obligation unless its "ruling rests on an error of law, a clearly erroneous finding of fact, or otherwise cannot be located within the range of permissible decisions.").

\* \* \*

For the reasons set forth above, the judgments of the District Court are **AFFIRMED**.

FOR THE COURT:

Catherine O'Hagan Wolfe, Clerk of Court