*United States v. Anastasio*

## In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2019

(Argued: April 28, 2020      Decided: August 19, 2020)

Docket Nos. 15-1453-cr(L), 18-328-cr(Con), 18-369-cr(Con), 18-421-cr(Con)

UNITED STATES OF AMERICA,

*Appellee,*

–v.–

JONATHAN DELGADO, MATTHEW SMITH, ISMAEL LOPEZ, DOMENICO
ANASTASIO,

*Defendants-Appellants.*[*]

B e f o r e :

JACOBS, POOLER, and CARNEY, *Circuit Judges.*

Defendant-Appellant Domenico Anastasio was charged with one count of racketeering conspiracy in violation of 18 U.S.C. § 1962(d) (the "RICO Conspiracy Count"), and two counts of murder in aid of racketeering in violation of 18 U.S.C. §§ 1959(a)(1) and (2) (the "VCAR Murder Counts"), based on his involvement with the 10th Street Gang in Buffalo, New York, and his role in the 2006 murders of Darinell

---

[*] The Clerk of Court is directed to amend the official caption to conform with the above.

Young and Brandon MacDonald. Following a five-week trial, the jury found him guilty on all counts, including on two "special factors" that, as part of the RICO Conspiracy Count, charged Anastasio with intentionally causing the deaths of MacDonald and Young in violation of New York Penal Law §§ 125.25(1) and 20.00 (the "Murder Enhancements"). For these crimes, the United States District Court for the Western District of New York (Arcara, *J.*) sentenced Anastasio to life in prison. In his appeal, which we consolidated with those of his three co-defendants, Anastasio attacks the sufficiency of the evidence underlying his convictions; he also challenges several rulings made by the District Court before trial. On review, we agree with Anastasio that the evidence was insufficient to convict him of aiding and abetting the murders of MacDonald and Young. We conclude further, however, that the government adequately proved Anastasio's knowing agreement to participate in a racketeering enterprise. Moreover, we discern no error in the District Court's *Batson* ruling, and no abuse of discretion in its denial of Anastasio's motion to sever his trial from that of his co-defendants. Accordingly, we **AFFIRM** Anastasio's judgment of conviction as to the RICO Conspiracy Count; **REVERSE** the judgment as to the VCAR Murder Counts and the Murder Enhancements of the RICO Conspiracy Count and direct the District Court to enter a judgment of acquittal on the VCAR Murder Counts and the Murder Enhancements; and **REMAND** the cause for **RESENTENCING**.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR RESENTENCING.**

---

PETER J. TOMAO, Esq., Garden City, NY, *for Defendant-Appellant* Domenico Anastasio.

MONICA J. RICHARDS, Assistant United States Attorney, *for* James P. Kennedy, Jr., United States Attorney for the Western District of New York, Buffalo, NY, *for Appellee* United States of America.

---

CARNEY, *Circuit Judge*:

Defendants-Appellants Domenico Anastasio, Jonathan Delgado, Ismael Lopez, and Matthew Smith (together, "Defendants") were convicted by a jury on conspiracy and racketeering charges relating to their involvement with the 10th Street Gang in Buffalo, New York, and their participation in the murders of Brandon MacDonald and

Darinell Young. For these crimes, the United States District Court for the Western District of New York (Arcara, *J.*) sentenced them each to life in prison. We now resolve Defendants' consolidated appeals in two opinions and an order, issued separately. We address Anastasio's challenges below.

Anastasio attacks his convictions and sentence on several grounds, only three of which we must reach to resolve this appeal. First, he challenges the sufficiency of the evidence supporting his three counts of conviction, one for racketeering conspiracy in violation of 18 U.S.C. § 1962(d) (the "RICO Conspiracy Count"), and two for murder in aid of racketeering in violation of 18 U.S.C. §§ 1959(a)(1) and (2) (the "VCAR Murder Counts"). In Anastasio's view, the government failed to prove that he knowingly agreed to participate in a racketeering scheme (as required by the RICO Conspiracy Count), or that he aided and abetted the murders of MacDonald and Young (as required by the VCAR Murder Counts and the New York law murder enhancements to the RICO Conspiracy Count). Anastasio also challenges two rulings made by the District Court before trial. He contends, in particular, that the government exercised its peremptory jury strikes on the basis of race, and that the District Court therefore erred by rejecting Anastasio's challenge under *Batson v. Kentucky*, 476 U.S. 79 (1986). In addition, Anastasio argues that the District Court abused its discretion when it denied his motion to sever his trials from that of his co-defendants, maintaining that the evidence against those individuals unfairly prejudiced the jury against him.

For the reasons that follow, we agree with Anastasio that the evidence adduced at trial fell short of establishing his guilt as an accomplice to murder. To satisfy the *actus reus* element of aiding and abetting under either federal or New York law, the government must prove that a defendant's conduct actually contributed to the success of the specific crime that the defendant is charged with aiding and abetting. Here, we see no basis in the record for concluding that Anastasio in any way prompted,

3

encouraged, or otherwise facilitated the commission of murder. Accordingly, we conclude that insufficient evidence supported the jury's guilty verdict on (a) the VCAR Murder Counts and (b) the two "special factors" of the RICO Conspiracy Count that charged Anastasio with intentionally causing the deaths of MacDonald and Young in violation of New York Penal Law §§ 125.25(1) and 20.00 (the "Murder Enhancements").

We reject, however, Anastasio's sufficiency challenge to the RICO Conspiracy Count itself, concluding that the government's evidence adequately established his knowing agreement to participate in a racketeering enterprise. Anastasio's remaining lines of attack, moreover, provide no basis for disturbing his conviction on that Count. As discussed in greater detail below, we discern no error in the District Court's rejection of Anastasio's *Batson* challenge and no abuse of discretion in its denial of his severance motion.[1]

We therefore AFFIRM Anastasio's judgment of conviction as to the RICO Conspiracy Count, REVERSE the judgment as to the two VCAR Murder Counts and the two Murder Enhancements of the RICO Conspiracy Count, and REMAND the cause for RESENTENCING.

## BACKGROUND

In 2009, local, state, and federal officers began a coordinated investigation in Buffalo, New York, into two rival street gangs operating there: the 10th Street Gang and the 7th Street Gang. These efforts led to a series of arrests and criminal prosecutions,

---

[1] Anastasio raises two additional challenges on appeal. First, he contends that the District Court erred by denying his post-verdict motion for a new trial, asserting that the motion should have been granted because insufficient evidence supported his liability as an accomplice to the murders of Young and MacDonald. Second, he attacks the length of his sentence, claiming that it violates his Eighth Amendment rights. Both challenges are made moot, however, by our decision to reverse the VCAR Murder Counts and the Murder Enhancements of the RICO Conspiracy Count. Thus, we do not address them further.

4

most of which ended with guilty pleas. Anastasio and his three co-defendants, however, proceeded to trial. During its roughly five-week course, the jury heard testimony from more than 50 witnesses, including ten members of the 10th Street Gang who had earlier pleaded guilty and cooperated with the government (the "Cooperators").[2]

## I. Factual Background

Viewed in the light most favorable to the government, the evidence adduced at trial tells the following story of Anastasio's involvement in the 10th Street Gang and his role in the murders of MacDonald and Young. *See United States v. Dupree*, 870 F.3d 62, 67 (2d Cir. 2017) ("Because defendants appeal their convictions following a jury trial, our statement of the facts views the evidence in the light most favorable to the government, crediting any inferences that the jury might have drawn in its favor.").[3]

### A. The 10th Street Gang

The 10th Street Gang (the "Gang") was comprised of adolescents and young adults who lived in the vicinity of 10th Street in the West Side of Buffalo, New York. In the 2000s, its members ran a narcotics-trafficking operation, "work[ing] together" to sell heroin, cocaine, crack cocaine, marijuana, and ecstasy from street corners, houses, and a park located within its territory. Smith App'x 2326.

---

[2] The ten Cooperators were: (1) Sam Thurmond, (2) Michael Corchado-Jamieson, (3) Derrick Yancey, (4) Christopher Pabon, (5) Jimmy Sessions, (6) Jimmarlin Sessions, (7) Jairo Hernandez, (8) Kyle Eagan, (9) Douglas Harville, and (10) Nicholas Luciano. The language quoted in this section of the Opinion is drawn primarily from the government and defense attorneys' examination and cross-examination of these Cooperators, which elicited testimony that was largely consistent as to the fundamental description of the Gang's operations and Anastasio's role in it.

[3] Unless otherwise noted, our Opinion omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

At its peak, the Gang numbered about 100 members. Its structure, however, was fairly loose and decentralized. Although its members sometimes met to discuss matters, it did not have any designated leaders. Nor did it have "any formal or informal rules" for being a member. Smith App'x 2846. Rather than "giv[ing] out assignments" to its ranks, the Gang let individual members decide for themselves "what role" to play and "how much work [to] put" into its operations. Smith App'x 2324, 2361. The process for admitting new recruits was, likewise ad hoc: the Gang generally accepted into its fold interested individuals who became "familiar with . . . the people in the neighborhood" and who generally "vibe[d]" with other members. Smith App'x 2317.

The 10th Street Gang was not entirely unstructured, however. According to the testimony of several Cooperators, the Gang organized itself around a loose hierarchy of roles. The "shooters" and the "older guys" generally held the most respected positions, followed by the "suppliers" and "sellers" of drugs, the "fighters," and (at the bottom) the "look-outs." Smith App'x 2323, 2838, 4666. To move up the ladder, individuals had to earn the respect of their peers by "putting in work" for the Gang. Smith App'x 2360-61. In this context, "work" included (among other things) selling drugs, committing robberies, and fighting, stabbing, shooting, or killing rivals. Gang members often learned of their associates' work through word-of-mouth: when an individual "did something" that could "earn [him] respect" within the Gang, he would typically tell those "closest" to him, and from there, "the word would disseminate among the various members." Smith App'x 2361-62.

Members of the 10th Street Gang were also united by their shared commitment to defend the Gang's territory and drug business. As one Cooperator explained, the "10th Street . . . had [a] reputation" to maintain. Smith App'x 3810. Gang members worried that, if they did not instill fear and respect in the community, outsiders would start selling narcotics in their neighborhoods and, as a result, siphon away the Gang's

6

"drug profits." Smith App'x 4129. Accordingly, the Gang used violence and intimidation as its core strategy. Older gang members, for example, instructed younger ones to "shoot rivals if they came into the neighborhood." Smith App'x 2338-39. Although the Gang did not patrol its territory in a scheduled or structured way, individual members would take it upon themselves to stop and question anyone whom they did not recognize. If an outsider attempted to sell drugs inside claimed territory, the Gang would expel that person from the neighborhood—by force if necessary. And if a rival gang or drug dealer "d[id] something" to a 10th Street member, "[t]here [was] always retaliation." Smith App'x 3810.

One of the Gang's main rivals was the 7th Street Gang, a group that operated in nearby neighborhoods. The two gangs fought regularly. In the early 2000s, these skirmishes mostly took the form of brawls and fist fights. In around 2004, however, the conflict escalated and began to include shootings. As the violence intensified, the 10th Street Gang began acquiring more firearms—amassing, by one Cooperator's estimate, more than 70 guns. Members would carry these firearms for protection whenever they "sold drugs" or "hung around" together. Smith App'x 2331.

B.     Anastasio's Association with the 10th Street Gang

At trial, several Cooperators identified Anastasio as a member of the 10th Street Gang. Anastasio apparently joined the Gang at some point in 2001 or 2002, after being introduced to its members through Sam Thurmond (a Cooperator) and two of Anastasio's cousins. He continued to associate with the Gang until at least 2010, when he attended a memorial rally for a deceased Gang member and can be seen in video footage "[t]hrowing up the M" hand sign for "M-O-B," another name used by the Gang. Smith App'x 2426.

Over those years, Anastasio's involvement with the Gang took a variety of different forms. According to testimony from the Cooperators, Anastasio acted as "a lookout" for "[a] lot" of the Gang's drug deals. Smith App'x 2852. On several occasions, he sold marijuana himself. Smith App'x 3646. In addition, Anastasio would bring firearms to the 10th Street park—the Gang's "home base"—to protect Gang members, sometimes "hid[ing] [these weapons] in the grass." Smith App'x 2847, 2853-54. Eventually, Anastasio began fighting rival gangs. In around 2004, for example, he joined a brawl between the 10th Street Gang and its 7th Street rival that included 80-100 total participants. Nothing in the record, however, suggests that Anastasio ever became a shooter for the Gang, although he did make his 12-gauge shotgun available to other members who, on at least one occasion, used that firearm to "sho[o]t up" a "known 7th Street house." Smith App'x 2457-61.

C.     The Murders of Young and MacDonald

We now turn to the events leading to the murders of Young and MacDonald—the heart of the government's case.

At around midday on April 16, 2006, Anastasio was "hanging out" with ten to fifteen members of the 10th Street Gang outside of "Sam's store," waiting to go to a picnic scheduled for later that afternoon. Smith App'x 2888-92. Before they departed for the picnic, however, several armed 7th Street members drove by in an "orange Chevy Cobalt" and opened fire on the group, striking Delgado's younger brother, Robert Sanabria, in the stomach. Smith App'x 2892-95, 3015.

After an ambulance arrived to transport Sanabria to a hospital, members of the 10th Street Gang—including Anastasio—gathered at a nearby park. There, the group discussed revenge. According to a Cooperator's testimony, Delgado said that "he wanted to . . . shoot back at the 7th Street members for shooting his brother," adding

8

that anyone who "could get a gun" should "get it." Smith App'x 2898, 2900. The group agreed that those who wanted to participate in the retaliation would meet at Thurmond's apartment, where Thurmond lived with his brother, James Foxworth.

At some point during these discussions, one of the Gang members noticed a woman (Stephanie Maldonado) and her boyfriend at the time (Juan Hernandez) walking down a nearby street. Suspecting that Hernandez was from 7th Street, the Gang members who were at the park confronted the couple. Maldonado denied that her boyfriend was part of 7th Street, but after a heated conversation, some members of the 10th Street Gang, including Anastasio, knocked Hernandez to the ground and started kicking him. When Maldonado attempted to intervene, the assailants "hit" and "stomp[ed]" on her as well. Smith App'x 4471.

After this beating, which lasted about a "[m]inute and a half," the 10th Street group dispersed, with some (including Anastasio) reconvening later at Thurmond's apartment. Smith App'x 2465.22, 2903. There, Delgado restated the plan to "shoot at [7th Street Gang members] because they had shot his brother," and he told those present (including Anastasio) that they needed to find guns. Smith App'x 2906. Several individuals then left to collect firearms and, when they returned, deposited those guns on Foxworth's bed. Delgado, for example, brought a .44 caliber handgun that he owned, along with a .380 caliber firearm that he had acquired from another Gang member at the park; Corchado-Jamieson borrowed "a sawed-down .22 rifle" from his stepsister's boyfriend, Smith App'x 2907; Thurmond took out his shotgun; and several members of the "Zolo Boys"—an "affiliate[]" of the 10th Street Gang—showed up at the apartment with two shotguns of their own, Smith App'x 2465.40, 2465.46.

Then, at some point that night, Smith informed Thurmond that he would "drive around the neighborhood" to locate members of the 7th Street Gang. Smith App'x 2465.39, 2465.48. Five to ten minutes later, Smith called Thurmond by phone, and said,

9

"[T]hey're out there at Nick's house on Pennsylvania. Go do what you all gotta do." Smith App'x 2465.48. Thurmond then relayed this information to those present (including Anastasio), telling them that "if [they] wanted to do anything, that's where [they] had to go." Smith App'x 2465.49.

Anastasio, however, had twice tried and failed to acquire a firearm for his own use.[4] In his first attempt, Anastasio picked up the .44 caliber pistol that Delgado had brought to the apartment. The gun—which had only a single bullet in it—was in poor condition: its "pin kept coming out"; its "barrel was loose"; and its "handle . . . was kind of messed up." Smith App'x 3073-74, 4485. Even so, Douglas Harville—a shooter for the Gang—demanded that Anastasio give him the weapon. Anastasio initially resisted, saying, "[N]o, I'm going." Smith App'x 4484. He eventually gave in, however, and handed Harville the .44 caliber firearm. Later that night, Anastasio tried (without success) to repurchase a shotgun that he had recently sold to one of the Zolo Boys.

Those who had firearms then proceeded to drive in two vehicles to 155 Pennsylvania Street, where "Nick's house" was located. Having no firearm, Anastasio remained in the apartment while the others drove to the scene of the crime.

When the shooters arrived at 155 Pennsylvania Street, they ran up and started firing at a group of individuals gathered on and near the front porch. Harville attempted to shoot the .44 caliber handgun that he had taken from Anastasio. "Nothing happened," however, when he "pulled the trigger": the gun apparently malfunctioned and left Harville unable to fire a single shot.[5] Smith App'x 4501. His associates, by

---

[4] At one point during the night, Anastasio also picked up a .22 Ruger that lay on Foxworth's bed. Another 10th Street Gang member ultimately ended up with this gun, however, and nothing in the record suggests that Anastasio attempted to claim the .22 Ruger as his own.

[5] After the shooting, Harville concluded upon inspecting the .44 caliber gun that it had not fired because of a problem with "the firing pin." Smith App'x 4510.

contrast, discharged approximately 50 bullets, killing MacDonald and Young, who were innocent bystanders, and injuring four others.[6]

The shooters then fled the scene, eventually making their way back to Thurmond's apartment, where they "talk[ed] about . . . what happened" and coordinated their alibis. Smith App'x 2465.84, 2465.87-88. During their debriefing, Anastasio—who was waiting at the apartment when the shooters returned—expressed his frustration at being left behind, asking another Gang member: "[W]hy didn't you let me go? Why didn't you let me go?" Smith App'x 4811-12. Concerned that law enforcement might look for the shooters at the apartment, one of the 10th Street Gang's members (Corchado-Jamieson) offered to store the shooters' weapons temporarily at his house. Sometime later, everyone at the apartment went their separate ways.

## II. Procedural History of the Prosecutions

On February 2, 2012, Anastasio was charged in a Fourth Superseding Indictment ("the Indictment") with one count of racketeering conspiracy in violation of 18 U.S.C. § 1962(d) (the "RICO Conspiracy Count"), and two counts of murder in aid of racketeering in violation of 18 U.S.C. §§ 1959(a)(1) and (2) (the "VCAR Murder Counts").[7] As part of the RICO Conspiracy Count, the Indictment also set forth two "special factors" that charged Anastasio with intentionally causing the deaths of Young and MacDonald in violation of New York Penal Law §§ 125.25(1) and 20.00 ("the Murder Enhancements"). Smith App'x 5542-43. The VCAR Murder Counts each carried

---

[6] Medical and ballistic testimony attributed the death of MacDonald to a bullet fired from Defendant Delgado's .380 firearm. The government could not conclusively identify the shooter who caused Young's death.

[7] When discussing the charges against Anastasio, we refer to the redacted, renumbered indictment that was provided to the jury.

a mandatory minimum sentence of life in prison, 18 U.S.C. § 1959(a)(1), and the Murder Enhancements raised the maximum penalty that Anastasio faced on the RICO Conspiracy Count to a life term of imprisonment, 18 U.S.C. § 1963(a).

Of the dozens of individuals charged in connection with the investigation of the Gang's operations, only Defendants proceeded to trial. As relevant to this appeal, Anastasio moved to sever his trials from the others, contending that his involvement with the Gang was minimal and that he would be unfairly prejudiced by the jury's consideration of evidence presented against his co-defendants. The District Court denied his motion, and the parties proceeded to jury selection. During that process, all four Defendants raised *Batson* challenges, claiming that the government had exercised its peremptory strikes on the basis of race when it moved to excuse two of the three individuals of Hispanic origin who were present in the venire. The District Court denied Defendants' *Batson* challenges, and shortly after, on August 1, 2014, the parties made their opening statements to the jury.

Following five weeks of trial, the jury found Anastasio guilty on all charges, including on the Murder Enhancements of the RICO Conspiracy Count. Anastasio then moved for a judgment of acquittal or, in the alternative, for a new trial under Rules 29 and 33 of the Federal Rules of Criminal Procedure. In both motions, Anastasio urged that the jury lacked sufficient evidence to find him guilty for aiding and abetting the murders of Young and MacDonald. In October 2017, the District Court denied these post-trial motions, relying primarily on Anastasio's decision to relinquish the .44 caliber handgun to Harville. *See United States v. Anastasio*, No. 09-CR-331-A, 2017 WL 4875422, at *1, 5-7 (W.D.N.Y. Oct. 30, 2017). By "handing th[is] gun to Harville," the District Court reasoned, Anastasio "aided the murderous retaliation at 155 Pennsylvania Avenue for the earlier shooting of Robert Sanabria." *Id.* at *6. Moreover, the District Court continued, Anastasio gave up "his own claim to the gun" knowing that Harville

12

and the others "would retaliate murderously" and "intend[ing] that they do so." *Id.* The District Court therefore sustained the jury's finding that Anastasio acted as an accomplice to murder.

In February 2018, the court sentenced Anastasio to concurrent life terms of imprisonment on each count of conviction—the mandatory minimum sentence for the VCAR Murder Counts and the statutory maximum sentence for the RICO Conspiracy Count. Anastasio then timely filed this appeal.

## DISCUSSION

Anastasio's appeal focuses primarily on the sufficiency of the evidence underlying his convictions. He contends, in particular, that the government failed to prove (1) that he aided and abetted the murders of MacDonald and Young, or (2) that he agreed to participate in a racketeering scheme. We address these sufficiency challenges first, before considering Anastasio's additional claims that the District Court erred by denying his *Batson* challenge and his motion to sever trials.

### I. Sufficiency of the Evidence

A defendant bears a "heavy burden" when he attacks a criminal conviction on the basis of insufficient evidence. *United States v. Tanner*, 942 F.3d 60, 64 (2d Cir. 2019). This is because in this procedural posture our "standard of review is exceedingly deferential." *United States v. Baker*, 899 F.3d 123, 129 (2d Cir. 2018). In evaluating a sufficiency challenge, we are required to "view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Babilonia*, 854 F.3d 163, 174 (2d Cir. 2017). We must sustain a jury's verdict, moreover, unless the "evidence that the defendant committed the crime is nonexistent or so meager that no reasonable jury

could find guilt beyond a reasonable doubt." *United States v. Ng Lap Seng*, 934 F.3d 110, 130 (2d Cir. 2019). Thus, "[t]he ultimate question is not whether *we believe* the evidence adduced at trial established [the] defendant's guilt beyond a reasonable doubt, but whether *any rational trier of fact could so find.*" *United States v. Corbett*, 750 F.3d 245, 250 (2d Cir. 2014) (emphasis in original).

A.   VCAR Murder Counts and Murder Enhancements

We begin by considering whether the evidence supports the government's theory that Anastasio aided and abetted the murders of Young and MacDonald. To resolve this question, we must consider the scope of accomplice liability under both New York and federal law. This is because the Murder Enhancements of the RICO Conspiracy Count charged Anastasio as an aider and abettor under New York Penal Law § 20.00, whereas the VCAR Murder Counts charged Anastasio as an aider and abettor under both New York Penal Law § 20.00 and 18 U.S.C. § 2.[8] As we discuss below, moreover, these two aiding-and-abetting provisions are not coextensive. Accordingly, we assess Anastasio's criminal liability under each statute separately, starting with 18 U.S.C. § 2.

1. *Aiding and Abetting under 18 U.S.C. § 2*

The general federal aiding-and-abetting statute provides in relevant part that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C.

_____

[8] The VCAR Murder Counts incorporated New York's accomplice law because they charged Anastasio with murder in violation of New York Penal Law §§ 125.25(1) ("Murder in the second degree") and 20.00 ("Criminal liability for conduct of another"). *See United States v. Mapp*, 170 F.3d 328, 335 (2d Cir. 1999) (observing that the VCAR murder statute, 18 U.S.C. § 1959, requires "the government to prove that the defendant committed murder—however that crime is defined by the underlying state or federal law").

14

§ 2(a).[9] As the Supreme Court recently explained in *Rosemond v. United States*, "[this] provision derives from (though simplifies) common-law standards for accomplice liability." 572 U.S. 65, 70 (2014). Thus, "[a]s at common law, a person is liable under § 2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." *Id.* at 71.

Here, we conclude that the government's evidence regarding Anastasio easily satisfies the "intent requirement"—*i.e.*, the *mens rea* element—of federal accomplice liability. *Id.* at 77. According to the Cooperators' testimony at trial, Anastasio was present when the Gang planned its attack on 155 Pennsylvania Street. Knowing full well the murderous intentions of the assembled group, Anastasio nonetheless attempted to acquire a firearm of his own so that he could join the shooters. Based on this conduct, a rational jury could conclude beyond a reasonable doubt that Anastasio "wishe[d] to bring about" the murders of Young and McDonald—an entirely foreseeable consequence of the retaliatory shooting. *Id.* at 76; *see also United States v.*

---

[9] The accompanying subsection, § 2(b), provides relatedly that "[w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." 18 U.S.C. § 2(b). The government does not appear to pursue the § 2(b) theory of accomplice liability on appeal. *See* Gov't Br. 80-81 (arguing that Anastasio "intentionally aided" the shooters). In any event, we find no evidence in the record to suggest that Anastasio was the "cause in fact" of the murders of MacDonald or Young. *See United States v. Concepcion*, 983 F.2d 369, 383-84 (2d Cir. 1992) ("§ 2(b) adopts the general princip[le] of causation in criminal law that an individual (with the necessary intent) may be held liable if he is a cause in fact of the criminal violation, even though the result which the law condemns is achieved through the actions of innocent intermediaries.").

*Nelson*, 277 F.3d 164, 197 (2d Cir. 2002) (holding that a jury may infer that "a person intends the ordinary consequences of his voluntary acts"). Indeed, Anastasio admitted as much when, after the shooters returned to the apartment and started talking about the shooting, Anastasio complained, "[W]hy didn't you let me go? Why didn't you let me go?" Smith App'x 4812. Thus, viewed in the light most favorable to the government, the trial evidence leaves us with no doubt that Anastasio possessed the *mens rea* necessary to be an accomplice to murder under § 2.

The more challenging question is whether Anastasio's conduct satisfied the "affirmative-act requirement"—that is, the *actus reus* element—of federal accomplice liability. *Rosemond*, 572 U.S. at 74. In urging that it does, the government highlights that Anastasio was present when the Gang planned its retaliatory attack; that he participated in the assault of Maldonado and her boyfriend at the park; that at the apartment he twice attempted to take control of one of the Gang's weapons for his own use; and that he handed the .44 caliber gun to Harville.

Anastasio responds that none of this conduct actually facilitated the commission of the two murders. He asserts, for example, that although he was present for the planning session, he did not offer any suggestions or make any contributions to forming the Gang's plans. He further maintains that his decision to relinquish the .44 caliber gun to Harville did not advance the commission of the murders at all—stressing, in particular, Harville's unchallenged testimony that the handgun malfunctioned during the shooting and that, as a result, Harville was unable to fire a single bullet. Thus, Anastasio submits, although he may have been an accomplice to *attempted* murder, he did not aid and abet the crimes that the Indictment charged him with: the murders of MacDonald and Young.

The affirmative act requirement for accomplice liability raises no more than a low hurdle for the government's proof to clear, it is true. *See United States v. Garguilo*,

16

310 F.2d 249, 253 (2d Cir. 1962) (Friendly, *J.*) ("[E]vidence of an act of relatively slight moment may warrant a jury's finding participation in a crime."). "In proscribing aiding and abetting," the Supreme Court has observed, "Congress used language that comprehends all assistance rendered by words, acts, encouragement, support, or presence." *Rosemond*, 572 U.S. at 73. For their part, "courts have never thought relevant the importance of the aid rendered." *Id.* at 75. Thus, a defendant's acts need "not advance each element of the offense" to support federal accomplice liability; "all that matters is that they facilitated one component." *Id.* at 74-75. Nor must a defendant provide more than a "minimal" amount of aid to qualify as an aider and abettor. *Id.* at 73. Indeed, as one venerable treatise put it, "'the quantity of assistance [is] immaterial,' so long as the accomplice did '*something*' to aid the crime." *Id.* (quoting R. Desty, *A Compendium of American Criminal Law* § 37a, p. 106 (1882)) (emphasis in original). This is because, as the Supreme Court has explained, "every little bit helps— and a contribution to some part of a crime aids the whole." *Id.*

At the same time, however, the *actus reus* element of federal accomplice liability is not so capacious as to encompass any act taken in relation to some identified criminal activity. Rather, our case law imposes at least two limitations. First, we have repeatedly emphasized that, to convict a defendant of aiding and abetting a crime, the government must prove that the defendant's "efforts contributed towards [the] success" of the crime, even if only at the margins. *See, e.g., United States v. Huezo*, 546 F.3d 174, 179 (2d Cir. 2008); *United States v. Smith*, 198 F.3d 377, 383 (2d Cir. 1999); *United States v. Labat*, 905 F.2d 18, 23 (2d Cir. 1990); *United States v. Wiley*, 846 F.2d 150, 154 (2d Cir. 1988); *United States v. Zambrano*, 776 F.2d 1091, 1097 (2d Cir. 1985). The government must prove that the defendant "*furthered* the criminal act." *United States v. Nusraty*, 867 F.2d 759, 766 (2d Cir. 1989) (emphasis in original); *see also United States v. Pipola*, 83 F.3d 556, 562 (2d Cir. 1996) ("To be convicted of aiding and abetting, the defendant must

17

have taken some conscious action that furthered the commission of the underlying crime."). Said another way: while the quantum of assistance provided by an accomplice may be trifling, it cannot be zero. Rather, to impose criminal liability under the federal aiding-and-abetting statute requires proof that a defendant performed *some* act that "directly facilitated or encouraged" the commission of a substantive crime. *United States v. Medina*, 32 F.3d 40, 45 (2d Cir. 1994).

Second, to support accomplice liability, the assistance rendered by a defendant must contribute to the success of "the specific underlying crime" for which the defendant is charged with aiding and abetting. *Pipola*, 83 F.3d at 562. This is because "aiding and abetting does not constitute a discrete criminal offense but only serves as a more particularized way of identifying persons involved." *Smith*, 198 F.3d at 383. In other words, "when a person is charged with aiding and abetting the commission of a substantive offense, the 'crime charged' is . . . the substantive offense itself." *United States v. Oates*, 560 F.2d 45, 55 (2d Cir. 1977); *see also Smith*, 198 F.3d at 383 (same). For this reason, a defendant who has been indicted for aiding and abetting a particular crime cannot be convicted based on evidence that he aided and abetted a second, separate crime, even if related to the first. *See United States v. Ledezma*, 26 F.3d 636, 641-42 (6th Cir. 1994) (reversing a defendant's conviction for possession with the intent to distribute where the defendant was involved in shipping drugs, but did not aid or abet the particular shipment that the indictment charged him with possessing); *see also Wiley*, 846 F.2d at 155 (refusing to infer from his participation in one fraudulent scheme that the defendant aided and abetted another "distinct," but related, fraudulent scheme). Instead, the government must prove that "the defendant consciously assisted the commission of the specific crime [charged in the indictment] in some active way." *Medina*, 32 F.3d at 45.

Several of our decisions help illustrate the impact of these two limitations on the types of acts that can support federal accomplice liability. In *Garguilo*, for example, we considered whether a defendant's mere presence at the scene of a crime could render him liable for aiding and abetting that crime. 310 F.2d at 253. Generally, we said, the answer is no, because accomplice liability requires a defendant to "do[] something to forward the crime." *Id.* at 254. We recognized, however, that in some cases, a defendant's presence may advance the commission of the crime: an example would be "the attendance of a 250-pound bruiser at a shakedown as a companion to the extortionist, or the maintenance at the scene of crime of someone useful as a lookout." *Id.* at 253. We therefore drew a distinction between those cases in which a defendant's presence "help[s]" or "positively encourage[s]" the commission of a crime and those cases in which a defendant's presence merely marks him as "a companion" to the actual perpetrator of the crime, observing that the former, but not the latter, can serve as a basis for accomplice liability under § 2. *Id.*

Later, in *Labat*, we addressed whether a defendant could be convicted as an accomplice for possession of cocaine based on his unsuccessful efforts to procure drugs for a co-conspirator. *See* 905 F.2d at 20-21, 22-23. The trial evidence showed that the defendant (Labat) told his co-conspirator (Moon) that he would try to obtain and personally deliver one kilogram of cocaine to Moon in New York. *See id.* at 20-21. While Labat worked to acquire and transport the drugs, however, Moon and one of his associates (Ray) obtained that same amount of cocaine from another source (Dentel) at a lower price. *Id.* at 21. Moon then sold those drugs to an undercover police officer, and on the basis of that sale, the government charged Labat with one count of possession with intent to distribute. *Id.* Upon reviewing the trial record, however, we found no evidence that Labat intended Moon to possess the specific kilogram of cocaine that formed the basis of Labat's possession charge—*i.e.*, the cocaine obtained from Dentel

and sold to the undercover officer. *See id.* at 23. "Nor," we continued, "was there any evidence that Labat's efforts made any contribution whatever to Moon's obtaining the cocaine from Dentel." *Id.* Thus, although Labat plainly intended for Moon to possess a kilogram of cocaine (and took steps to facilitate that criminal objective), we reversed Labat's conviction for possession with intent to distribute, concluding that insufficient evidence supported the specific possession charge set forth in the indictment. *See id.*

For purposes of Anastasio's appeal, however, our decision in *Medina* offers perhaps the most relevant illumination of the affirmative act requirement for federal accomplice liability. *See* 32 F.3d at 45-46 (Jacobs, *J.*). In that case, a jury convicted the defendant (Medina) of, among other crimes, aiding and abetting the use or carriage of firearms during an attempted robbery, in violation 18 U.S.C. §§ 924(c) and (2). *See id.* at 42. According to the government's evidence, Medina devised a plan for three of his associates (Lopez, Villanueva, and Delgado) to rob Medina's former employer. *Id.* at 42. In the days before the heist, Medina asked Lopez whether he had a gun. *Id.* at 43. When Lopez responded that Villanueva had a firearm (but Lopez apparently did not), Medina gave Lopez a revolver and instructed him on how to use it. *Id.* Lopez turned out to be a confidential informant, however, and he handed Medina's revolver over to a government agent before the robbery was attempted. *Id.*

Reviewing this evidence, we reversed Medina's § 924(c) conviction on sufficiency grounds, concluding that "Medina performed no act that specifically aided and abetted the use or carrying of a gun during the attempted robbery." *Id.* at 42. His conviction could not rest on the revolver that Medina gave to Lopez, we explained, because that firearm "was not carried or used by anyone during the attempted robbery." *Id.* at 45. Nor was it supported by the fact that "Villanueva and Delgado each carried a semi-automatic weapon to the attempted robbery," since we saw "no evidence that Medina acted in any way to facilitate or encourage the use or carrying of those

20

weapons." *Id.* We further observed that, while Medina was the mastermind behind the robbery, "his plans did not entail a gun that was actually used or carried during the attempted robbery." *Id.* at 42. Thus, because nothing in the factual record suggested that Medina aided or abetted the use or carriage of a firearm by any of the robbers, we reversed his conviction under § 924(c). *See id.* at 45.[10]

Applying this case law to the record before us, we conclude that Anastasio's conduct is not enough to satisfy the affirmative act requirement of federal accomplice liability. Although Anastasio was present while members of the 10th Street Gang discussed and formulated its scheme for revenge, nothing in the record suggests that Anastasio spoke during—much less contributed to—this planning process. Nor has the government offered evidence that Anastasio's mere presence at Thurmond's apartment

---

[10] We also rejected the notion that Medina aided and abetted the commission of a § 924(c) offense merely because he "performed an act to facilitate or encourage the robbery." *Medina*, 32 F.3d at 45. In doing so, we reasoned that the "specific crime" prohibited by § 924(c) is the use or carriage of a firearm during and in relation to a predicate crime (*e.g.*, a robbery), not the predicate crime itself. *Id.* Later, in *Rosemond*, the Supreme Court rejected this interpretation of § 924(c). *See* 572 U.S. at 75. Characterizing § 924(c) as a "double-barreled crime" that involves both "the use or carriage of a gun" and "the commission of a predicate (violent or drug trafficking) offense," *id.* at 71, the *Rosemond* Court concluded that an individual could aid and abet a § 924(c) violation "by facilitating either [the predicate offense] . . . or the firearm use (or of course both)," *id.* at 74.

Thus, had *Rosemond* been handed down before we decided *Medina*, we likely would not have reversed Medina's conviction in light of his contributions to the attempted robbery (*i.e.*, the predicate offense). *Rosemond* casts no doubt, however, on *Medina*'s requirement that an aider-and-abettor must actually contribute to the success of the underlying offense. Indeed, the majority opinion in *Rosemond* repeatedly acknowledges that federal accomplice liability requires a defendant to "*d[o] something* to aid the [substantive] crime." *Id.* at 73 (emphasis in original); *see also, e.g., id.* at 74 ("[W]e approved a conviction for abetting mail fraud even though the defendant had played no part in mailing the fraudulent documents; it was enough to satisfy the law's conduct requirement that he had in other ways aided the deception."); *id.* at 74–75 ("It is inconsequential . . . that [a defendant's] acts did not advance each element of the offense; all that matters is that they facilitated one component.").

encouraged or otherwise influenced the Gang to commit the murders. Indeed, as far as we can tell from the record, Anastasio played no "role" in the execution of the retaliatory shooting "beyond that of a companion" to the shooters, and even that he did at a distance from the shooting. *Garguilo*, 310 F.2d at 253. He did not, for example, supply any of the firearms used during the shooting; provide any information on the location of the 7th Street Gang; serve as a look-out during the shooting; transport any of the shooters to or from 155 Pennsylvania Street; or, after the crime, help shield the shooters from police investigation.

The government points out that Anastasio *attempted* to acquire a firearm of his own, and that he later held the .44 caliber handgun and relinquished it to Harville. But the attempt to acquire a gun failed;[11] and as to the gun at issue, Anastasio did not bring it to the apartment. Rather, he found it in a common pile of guns that others had brought, and he unwillingly yielded it to a more senior member of the Gang. His conduct therefore had no more impact on the event than Medina's delivery of a gun to a confidential informant, or Labat's unsuccessful efforts to procure cocaine for Moon. *See Medina*, 32 F. 3d at 45-46; *Labat*, 905 F.2d at 23. In those cases and in this one, the defendant did nothing to "*further*[] the criminal act" or "contribute[] toward[] its success." *Nusraty*, 867 F.2d at 766; *Zambrano*, 776 F.2d at 1097. The Young and MacDonald murders were—at least with respect to Anastasio—a "foregone conclusion." *Medina*, 32 F.3d at 46. The gun was always going to be available, and a Gang member (likely Harville) was always going to bring it to the ambush.

---

[11] The government did not charge Anastasio with attempted aiding and abetting, a putative crime that some of our sister circuits have suggested does not even exist under federal law. *See, e.g.*, *United States v. Jayavarman*, 871 F.3d 1050, 1056 (9th Cir. 2017); *United States v. Samuels*, 308 F.3d 662, 669 (6th Cir. 2002); *United States v. Giovannetti*, 919 F.2d 1223, 1227 (7th Cir. 1990).

## 2. *Aiding and Abetting under New York Penal Law § 20.00*

We need not tarry long on whether Anastasio aided and abetted the two murders under New York Penal Law § 20.00.[12] Although the principles of accomplice liability under New York law differ somewhat from the corresponding federal law,[13] they impose at least two overlapping requirements that, together, resolve Anastasio's appeal.

First, consonant with our interpretation of the federal aiding-and-abetting statute, New York courts have held that under § 20.00, a defendant's "mere presence at the scene of a crime, even with knowledge that the crime is taking place, or mere association with the perpetrator of a crime, is not enough for accessorial liability." *E.g.*, *People v. Lopez*, 137 A.D.3d 1166, 1167 (2d Dep't 2016); *In re Tatiana N.*, 73 A.D.3d 186, 190-91 (1st Dep't 2010); *see also People v. Cabey*, 85 N.Y.2d 417, 422 (1995) ("[A] defendant's presence at the scene of the crime, alone, is insufficient for a finding of criminal liability."). Indeed, at least one Appellate Division has gone further and found no accomplice liability where a defendant was both present at the scene of the crime and uttered words of encouragement to the perpetrator—conduct that would likely qualify as aiding and abetting under federal law. *Compare People v. Fonerin*, 159 A.D.3d

---

[12] Section 20.00 provides:

> When one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting with the mental culpability required for the commission thereof, he solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct.

N.Y. Penal Law § 20.00.

[13] For example, § 20.10 of the New York Penal Law provides that a person is not criminally liable for an offense committed by another person "when his own conduct, though causing or aiding the commission of such offense, is of a kind that is necessarily incidental to the commission of the offense." *People v. Manini*, 79 N.Y.2d 561, 569 (1992). As the New York Court of Appeals has noted, however, the United States Code does not appear to contain a comparable exception for federal aiding-and-abetting liability. *See id.* at 572.

717, 719 (2d Dep't 2018) (no accomplice liability where a defendant said, "Do that shit, man," right before his co-defendant set the victim on fire), *with Garguilo*, 310 F.2d at 253 ("[I]t is enough if the presence of the alleged aider and abettor has . . . positively encouraged the perpetrator . . . .").

Second, just as we have said that a defendant must actually contribute to the success of a crime to qualify as an aider and abettor under 18 U.S.C. § 2, the New York Court of Appeals has interpreted the state's accomplice statute as requiring evidence that "a defendant exhibited [some] calculated or direct behavior that purposefully affected or furthered the [substantive crime]." *People v. Bello*, 92 N.Y.2d 523, 526 (1998). This requirement, New York courts have explained, is "integral" to criminal liability under § 20.00. *E.g., id.*; *People v. Slade*, 133 A.D.3d 1203, 1204 (4th Dep't 2015). In line, then, with our case law on federal accomplice liability, a defendant is not an aider-and-abettor under New York law unless he "personally engaged in some voluntary act that was specifically connected to the [actual perpetrator's] misconduct," *People v. Byrne*, 77 N.Y.2d 460, 467 (1991), and in doing so, he "intentionally and directly assisted in achieving the ultimate goal of the [criminal] enterprise," *Bello*, 92 N.Y.2d at 526.

Here, as discussed in detail above, nothing in the record suggests that Anastasio's conduct "affected or furthered" the murders for which he is charged with aiding and abetting. *Id.* Rather, the government's evidence merely establishes that Anastasio associated with the perpetrators of those crimes in the hours leading up to and then following the shooting. Thus, for the same reasons that Anastasio did not aid or abet the two murders as a matter of federal law, we conclude that he did not act as an accomplice within the meaning of New York Penal Law § 20.00. Accordingly, we reverse the judgment of conviction that is based on the jury's verdict as to the VCAR Murder Counts and the Murder Enhancements of the RICO Conspiracy Count.

24

B.  RICO Conspiracy Count

In contrast, we find no merit in Anastasio's sufficiency challenge to his conviction on the RICO Conspiracy Count. The conspiracy provision of RICO, 18 U.S.C. § 1962(d), "proscribes an agreement to conduct or to participate in the conduct of an enterprise's affairs through a pattern of racketeering activity." *United States v. Arrington*, 941 F.3d 24, 36 (2d Cir. 2019). As the Supreme Court has explained, RICO's definition of an "enterprise" is "broad": it generally encompasses any "group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 944, 946 (2009). An enterprise, in turn, engages in "a pattern of racketeering activity" when its members commit at least two racketeering acts—such as murder, narcotics trafficking, or robbery—that both "[are] related to one another" and "have a nexus to the enterprise" (the so-called "predicate acts"). *United States v. Cain*, 671 F.3d 271, 284 (2d Cir. 2012); *see also* 18 U.S.C. § 1961(1) (defining "racketeering activity").

Importantly, the crime of RICO conspiracy "centers on the act of *agreement*." *United States v. Applins*, 637 F.3d 59, 81 (2d Cir. 2011) (emphasis in original). Thus, in contrast to RICO's substantive offenses, *see, e.g.*, 18 U.S.C. § 1962(c), "the Government need not establish the existence of an enterprise" to "prove a RICO conspiracy," *Arrington*, 941 F.3d at 36. Nor must it establish that a pattern of racketeering activity actually took place. *See United States v. Zemlyansky*, 908 F.3d 1, 11 (2d Cir. 2018) ("To prove the pattern element, the government must show that two or more predicate acts were, or were intended to be, committed as part of the conspiracy."). Rather, the government "need only prove that the defendant knew of, and agreed to, the general criminal objective of a jointly undertaken scheme." *Arrington*, 941 F.3d at 36-37.

Here, a rational factfinder could conclude beyond a reasonable doubt that Anastasio agreed with other members of the 10th Street Gang to function as a unit for

25

the common purpose of selling drugs. As the grand jury charged in the Indictment, and the government proved at trial, Gang members worked together to distribute drugs in their territory, organizing themselves into a loose hierarchy of roles and responsibilities. *See Applins*, 637 F.3d at 73 ("[A]n association-in-fact enterprise under RICO need not have a hierarchical structure, a chain of command, or other business-like attributes."). In doing so, they viewed themselves as a single group united by a shared identity. To protect both the profits and "reputation" of the 10th Street Gang, Smith App'x 3810, members intended to—and did in fact—engage in a pattern of racketeering activity that included murder, robbery, and the distribution of drugs.

The jury was entitled to find, moreover, that Anastasio knowingly agreed to join and facilitate this racketeering scheme. The Cooperators identified Anastasio as an active member of the Gang: one who served as a lookout during drug deals, sold marijuana, and fought rival gangs. Although Anastasio's actions at the apartment where the murders were planned did not render him an accomplice to the murders, his conduct there certainly provides a reasonable basis for inferring that Anastasio knew about, and agreed to, "the general criminal objective" of the 10th Street Gang. *Arrington*, 941 F.3d at 36-37. In light of this and other evidence showing Anastasio's efforts to facilitate the Gang's racketeering activity, we have no doubt that a reasonable jury could convict him of RICO conspiracy.

In arguing to the contrary, Anastasio faults the government for purportedly not proving that Anastasio himself engaged in—or intended to engage in—at least two acts of racketeering. As we have explained on multiple occasions, however, "[s]o long as [a] defendant knowingly agreed to facilitate the general criminal objective of a jointly undertaken racketeering scheme, the government need not prove that he or she knowingly agreed to facilitate any specific predicate act." *Zemlyansky*, 908 F.3d at 11. Rather, we have said, "it suffices to show that [the defendant] intended that the broad

26

goals of the racketeering scheme be realized, along with evidence that some (or any) members of the conspiracy intended that specific criminal acts be accomplished." *Id.* Because we conclude that the government's evidence against Anastasio satisfies this standard, we reject Anastasio's sufficiency challenge to his conviction on the RICO Conspiracy Count.

## II.    Pretrial Rulings

We also identify no reversible error in the District Court's decisions to deny Anastasio's *Batson* challenge and his motion to sever his trial from that of his co-defendants.

As to the former, all four Defendants claim that the government exercised its peremptory strikes on the basis of race when it moved to excuse two of the three Hispanic individuals who were present in the venire. As we explain, however, in a separate opinion resolving Delgado's appeal, the District Court did not clearly err in crediting the government's statement of its non-discriminatory reasons for striking those prospective jurors. *See United States v. Farhane*, 634 F.3d 127, 154 (2d Cir. 2011) ("Such a ruling represents a finding of fact, which we will not disturb in the absence of clear error."). We now adopt and incorporate that *Batson* analysis here, reaffirming that the record before us discloses no basis for disturbing the District Court's *Batson* determination.

As for severance, Anastasio urges that he was entitled to a separate trial because of his purportedly minimal role in the 10th Street Gang. In Anastasio's view, the vast bulk of the evidence presented at trial had nothing to do with him, but rather concerned his co-defendants' violent acts and drug deals. This evidence, he contends, had a prejudicial "spillover effect," leading the jury to convict Anastasio "based not on what he did but on what others around him did." Anastasio's Reply Br. 1.

A district court may sever trials if "the joinder of offenses or defendants . . . appears to prejudice a defendant." Fed. R. Crim. P. 14(a). The decision to sever, however, is "committed to the sound discretion of the trial judge," and we will not override an exercise of that discretion absent "clear abuse." *United States v. Chang An-Lo*, 851 F.2d 547, 556 (2d Cir. 1988). "It is not enough," we have said, for a defendant "to demonstrate that separate trials would have increased the chances of the [defendant's] acquittal." *United States v. Spinelli*, 352 F.3d 48, 54-55 (2d Cir. 2003). Instead, the defendant must "show prejudice so severe as to amount to a denial of a constitutionally fair trial, or so severe that his conviction constituted a miscarriage of justice." *United States v. Blount*, 291 F.3d 201, 209 (2d Cir. 2002).

Anastasio has not carried this "heavy burden." *Chang An-Lo*, 851 F.2d at 556. As an initial matter, we conclude that much of the evidence presented at trial "would have been admissible at a separate trial of [Anastasio], since it was relevant to proving the nature and scope of the [RICO] conspiracy in which [all Defendants] were, to differing degrees, involved." *Spinelli*, 352 F.3d at 56. The testimony concerning the 10th Street Gang's structure and criminal activity, for example, helped to establish it as "a racketeering scheme" that "involved, or by agreement between any members of the conspiracy was intended to involve, two or more predicate acts of racketeering." *Zemlyansky*, 908 F.3d at 11. Likewise, the shooting at 155 Pennsylvania Street—the focal point of the five-week trial—was probative of Anastasio's agreement to join that racketeering scheme. Although the government's evidence concerning the retaliatory shooting failed to establish Anastasio's liability as an accomplice to murder, it certainly illustrated his knowledge of, agreement to, and participation in the Gang's criminal objectives.

To be sure, the record reflects that Anastasio played a less prominent role in the 10th Street Gang than did some of his co-defendants. As we have explained elsewhere,

28

however, "differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." *E.g.*, *United States v. Carson*, 702 F.2d 351, 366-67 (2d Cir. 1983); *United States v. Scarpa*, 913 F.2d 993, 1015 (2d Cir. 1990). Indeed, not only are joint trials "constitutionally permissible" when they place "defendants who are . . . marginally involved alongside those heavily involved"; they are "often particularly appropriate in circumstances where the defendants are charged with participating in the same criminal conspiracy." *Spinelli*, 352 F.3d at 55. That is what the District Court faced here.

We are reassured by the District Court's express direction to the jury that it must consider the guilt of each Defendant "separately," and its reminder that "[a] person may know or be friendly with a criminal without being a criminal himself." Smith App'x 5394, 5420. These instructions sufficiently addressed the risk of spillover prejudice to Anastasio that joinder of Defendants' trials might have produced. *See Chang An-Lo*, 851 F.2d at 556-57 (concluding that similar jury instructions mitigated the risk of spillover prejudice). Absent any particularized claim of prejudice, we are unable to discern any abuse of discretion—much less a "clear abuse"—in the District Court's denial of Anastasio's motion to sever. *Scarpa*, 913 F.2d at 1014.

## CONCLUSION

For the reasons set forth above, we **AFFIRM** Anastasio's judgment of conviction as to the RICO Conspiracy Count; we **REVERSE** the judgment as to the two VCAR Murder Counts and the two Murder Enhancements, and direct the District Court to enter a judgment of acquittal on the VCAR Murder Counts and the Murder Enhancements; and we **REMAND** the cause for **RESENTENCING**.